UNITED STATES of America,
Appellee,

v.

Eduardo POETA, Appellant.

No. 322, Docket 71–1682.

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1971.

Decided Jan. 24, 1972.
Certiorari Denied May 22, 1972.
See 92 S.Ct. 2041.

Edward R. Korman and Raymond J. Dearie, Asst. U. S. Attys. (Robert A. Morse, U. S. Atty., for Eastern District of New York and David G. Trager, Asst. U. S. Atty., on the brief), for appellee.

Patrick M. Wall, New York City, for appellant.

Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

Eduardo Poeta, found to be a central participant in an international heroin smuggling operation, appeals from a judgment of March 19, 1971 in the Eastern District sentencing him to imprisonment for 40 years and fines totalling $300,000,[1] following his conviction by a jury on 14 counts of illegally importing and distributing heroin in the United States, 21 U.S.C. §§ 173 and 174, and one count of conspiring to do so.

Poeta's only claims of error relate to the admission of two conversations intercepted on July 10 and 11, 1970 over the telephone of his co-defendant Luis Stepenberg[2] on the grounds that the judge's order authorizing the tap was invalid, that the conversations intercepted were seized more than a week after Poeta and Stepenberg had been indicted and constituted an infringement of Poeta's right to counsel, that the government failed to minimize the extent of its wiretapping in violation of 18 U.S.C. § 2518(5), and that the recordings of the intercepted conversations were not made available to the court issuing the order within the time required by the governing federal statute. We find no error in the admission of this evidence and, accordingly, the conviction is affirmed.

Entirely apart from the wiretap conversations, the evidence against Poeta, who did not testify in his own behalf,[3]

---

1. Poeta was convicted on one count (15) of conspiracy and 14 substantive counts (1–14). He was sentenced to a term of imprisonment of 20 years on Counts 1, 3, 5, 7, 9, 11 and 13, sentences to run concurrently, and 20 years on Counts 2, 4, 6, 8, 10, 12, 14 and 15, sentences to run concurrently, and fined $20,000 on each count.

2. Luis Stepenberg was tried with Poeta and convicted, but died before sentencing.

3. Nor did Stepenberg.

was overwhelming. The government's case was built principally on the testimony of two witnesses: Jaime Cohen, a confederate of Poeta and Stepenberg, who had assisted them for two years in selling the heroin which they imported, and Felix Martinez, who had purchased large quantities of heroin from Cohen and Poeta on numerous occasions. In addition, federal and state narcotics agents had observed and filmed many of the meetings between the coconspirators and so testified.

The evidence showed that the scheme began when, following instructions given by Stepenberg at a meeting in Rio de Janeiro, Brazil in December 1968, Cohen rented a house on Dartmouth Street in Forest Hills, New York. The Dartmouth Street house was used as a distribution point for the smuggled heroin. On fourteen different occasions between June 1969 and February 1970, Poeta and his coconspirators Stepenberg and Jacobo Grodntzsky [4] smuggled quantities of heroin, ranging from one to ten kilos, into the country and to the Dartmouth Street house. When the heroin arrived at Dartmouth Street, Poeta would contact Cohen telling him that the heroin was there and giving the precise location of its hiding place within the house. Poeta instructed Cohen to go to the house on at least seven different occasions. After retrieving the heroin, Cohen would contact a purchaser, deliver the heroin in quantities ranging from one to ten kilos, and collect payment in cash which he would deliver immediately to Poeta. By February 1970, Cohen had sold approximately 20½ kilos of heroin, at $13,500 per kilo or $8,000 for half a kilo, for an approximate total of $293,000.

Cohen was arrested in February 1970 and 8½ kilos were recovered in an apartment at 42–25 80th Street, Queens, New York, which Cohen rented. After a few days in jail where he was held unable to post $250,000 bail, he agreed to cooperate with state and federal authorities. Released on bail of $15,000, Cohen resumed his operations with Poeta and Stepenberg, but kept the authorities informed of their activities and consented to electronic surveillance of his telephone and his apartment at 92–28 57th Street, Queens, New York, where he resided.

Wiretap surveillance was begun on March 19, 1970, when the District Attorney of Queens County obtained an order from New York Supreme Court Justice Leahy which authorized a wiretap on Cohen's telephone 592–5459 at the Forest Hill house.[5] No objection is made to this order nor the four subsequent orders of April 17, May 15, May 28 and June 15 which authorized continued tapping, as Cohen had consented to all these taps.

Relying on information received from these taps, the District Attorney, on April 22, 1970, obtained an order from Justice Schweitzer of the New York Supreme Court which authorized the New York City Police Department to wiretap the telephone of Luis Stepenberg's father at 711 West End Avenue in Manhattan, 866–2971, on the allegation that Luis Stepenberg generally used that telephone.

The affidavit of Detective Reid in support of the District Attorney's application for the April 22 order referred in detail to four conversations which had been heard over the tap on Cohen's telephone: On March 19, using Cohen's telephone Felix Martinez had called one Isabel Benitz and told her to deliver one-half kilo of cocaine to him at a certain place; on March 20, Cohen had called Martinez and they talked about

---

4. Grodntzsky is presently a fugitive from justice.

5. The New York State eavesdropping statute, New York Crim.Proc.L. art. 700, McKinney's Consol.Laws, c. 11–A, was enacted in 1969 with the intention that it conform to the federal statute, 18 U.S.C. § 2510 et seq., which had been enacted the previous year. As enacted, the New York statute replaced the previous law which had been held invalid by the Supreme Court in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

the delivery of cocaine arranged the day before; on April 11, Cohen had called Luis Stepenberg who spoke about paying Cohen both for his participation in a prior narcotics sale and for his attorney's fee incurred as a result of his February arrest which had uncovered 8½ kilos of heroin and led to his cooperation with the police; and finally, on April 11, Martinez and Cohen had spoken regarding the receipt and quality of one kilo of cocaine delivered to Cohen by Isabel Benitz.

On May 7, Justice Schweitzer amended his order of April 22 to permit the tapping of the telephone, 787–1624, which Stepenberg recently had installed in his own apartment at 155 West 68th Street, Manhattan. On May 21, 1970 Judge Schweitzer reauthorized the tapping of this telephone on the further application of the District Attorney, supported by an affidavit of Detective Reid which related to a conversation intercepted on May 16, 1970 between Poeta and Stepenberg concerning a shipment of narcotics from Argentina.

On June 19 the District Attorney secured a further authorization of the wiretap order and it was under this order that the July 10 and 11 Poeta-Stepenberg conversations were intercepted.

In the July 10 conversation, Poeta told Stepenberg to "desist" from further operations as he had spotted a tail; in the July 11 conversation, Poeta talks of a day at the races, apparently code language regarding a shipment of heroin. Poeta now contends that the June 19 wiretap, and hence the July 10 and 11 seizures made under it, were invalid and that his conviction must be reversed. He advances two arguments: first, that the June 19 order was invalid since it was granted largely on the basis of a conversation illegally intercepted on May 16; and, second, that the June 19 order was invalid because there was no new showing of probable cause in the application for it.

■ Our examination of the record order convinces us that the seizure of the May 16 conversation was authorized by Justice Schweitzer's order of April 22. Appellant has argued that the seizure was not authorized because the April 22 order "terminated automatically as soon as it had resulted in the interception of the first pertinent conversation" and this must have occurred prior to May 16. We disagree.

Affidavits in support of the order showed that the wiretaps previously authorized had provided evidence of extensive dealings in large quantities of heroin and cocaine by Stepenberg, Poeta, Martinez and Benitz. The District Attorney's affidavit points out the difficulties of securing evidence by normal investigative means in view of the manner of operations of the persons surveilled, their elusiveness, their frequent use of Spanish and their use of "narcotic jargon in an attempt to disguise the purpose of their transactions."

After stating that a 30-day period is required for eavesdropping the District Attorney's affidavit states that the authorization should *not* automatically terminate when communications of the nature described have first been obtained as it is believed that additional such communications will occur. In support of this, it is pointed out that meetings have been set up "which have proved to be spurious and are apparently made to avoid detection or disclose any possible police surveillance" and that "[t]he relationships of persons trafficking in narcotics are of a constantly changing nature."

Obviously the District Attorney and the police applied for an order which would allow for wiretapping for a full 30 days of all conversations relating to transactions in narcotics. Authority to seize only one conversation would have been wholly insufficient. In the order as signed, however, there was stricken out by typewritten "X" marks a provision which read

Ordered, that sufficient showing having been made in the application therefore the said effective period of

authorized eavesdropping shall not and the same hereby is not to terminate when communications of the type particularly described herein are first obtained; and it is further

We are convinced that the typist meant to strike out only the paragraph following in the order form which was clearly not pertinent as it referred to "secret entry." That the typist struck out the "nontermination" paragraph inadvertently is indicated by the nature of the supporting affidavit, which we have described at length, and the fact that, in several places, the order speaks of "conversations" and "communications." Moreover, the order further provided that

> Ordered, that in order to minimize the interception of communications not otherwise subject to eavesdropping under law, the law enforcement agency herein designated shall, whenever possible, ascertain the hours of the day and the days of the week during which communications authorized herein to be intercepted are in fact made, and, upon ascertaining such hours and days, communications shall be intercepted only at such times; and it is further

This provision is entirely meaningless if the order is to be limited to one conversation and then automatically to expire upon the interception of the first conversation, as Poeta claims.[6]

As Chief Judge Mishler wrote, on February 5, 1971, in denying Poeta's motion to suppress these wiretap interceptions:

> The order of April 22, 1970, authorized the interception of "conversations regarding the importation, sale, distribution, transportation, and whereabouts of cocaine and other narcotic drugs, the method of payment of such drugs and the recipients thereof."

To interpret this authorization as limited to a conversation of the type sought is to unduly and unrealistically restrict the scope of the order. The affidavit in support of the order indicates the extensive and varied scope of defendant's illegal operations. The order, by its express terms, authorized more than seizure of a conversation. The authorization was expressed in language broad enough to permit the intercepted conversations recorded and sufficiently particularized to meet the standards of Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873 [18 L.Ed.2d 1040] (1967).

We hold that, even though the "nontermination" paragraph had been struck from the Schweitzer order, the order was in substantial compliance with the requirements of 18 U.S.C. § 2518(4)(e), which provides that every order shall state whether or not the interception "shall automatically terminate when the described communication has first been obtained," and that it allowed the interception of more than one conversation regarding narcotics smuggling. For these reasons we conclude that the May 16 interception was authorized and that, along with other statements in the affidavits of the District Attorney and Detective Reid, it furnished a sufficient basis for the Schweitzer order of May 21, 1970 and the later June 19 order.

Poeta's second argument, that the July 10 and 11 seizures were invalid because there was no present probable cause supporting the June 19th order, also must fail. The application for the June 19 order indicated that the defendants were planning to import narcotics into the country and that a wiretap was a necessary means of securing evidence of this fact. Supporting the District Attorney's application and relied upon to supply present probable cause for the June 19 order was the May 21 affidavit

---

6. Rather than rely on the face of the order plus the application to support the inference that the "nontermination" paragraph had been inadvertently struck, the better practice would have been for the government to have called to testify the District Attorney seeking the order or the typist who made the order or even the judge who issued it.

of Detective Reid which in turn relied upon information received in the May 16 interception. Based on this interception Detective Reid stated that Poeta and Stepenberg received "a telegram . . . from Buenos Aires, Argentina stating that a shipment of narcotics is in the process of delivery but has been delayed temporarily." The incorporation of the affidavit into the application for the June 19 order indicates that the heroin shipment was still delayed, but also still expected. The reasonable belief that a shipment was expected was sufficient to supply the necessary present probable cause.

■ Appellant's third claim is that the July 10 and 11 intercepts should not have been received in evidence because the police had failed to minimize the quantity of material intercepted in the course of the taps. 18 U.S.C. § 2518(5). However, this tap was on Stepenberg's telephone, not Poeta's. Poeta lacks standing to contest any such invasion of Stepenberg's rights. *E. g.*, Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

■ Poeta next claims that the intercepted conversations of July 10 and 11 were inadmissible as they occurred after the sealed indictment was returned on July 2, 1970 and thereby rendered the continued surveillance both unnecessary and a violation of his Sixth Amendment right to counsel. We disagree. The illegal activities of appellant and his co-conspirators did not cease with the filing of the sealed indictment. The propriety of continuing an investigation of criminal activities after one or more of the participants has been indicted is not open to question. Massiah v. United States, 377 U.S. 201, 207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1963). Nor is there any basis for claiming violation of the Sixth Amendment right to counsel in the government's using a lawfully overheard conversation concerning continuing criminal conduct which was in no way elicited by a government agent or by the police. Where criminal activities are continuing, as they were here, it is the duty of the government to attempt to secure evidence thereof regardless of whether any indictment has been returned against any participant in the continuing activities. United States v. Edwards, 366 F.2d 853, 873 (2d Cir. 1966).

■ Poeta's final claim is that the wiretap evidence should have been excluded because the New York police violated the statute, 18 U.S.C. § 2518(8)(a), by failing to make their recordings available to the court for sealing purposes immediately upon expiration of the last wiretap order which expired on August 19, 1970. We disagree. Apparently the recordings were not immediately sealed after the expiration of the taps because the police were under the impression that only the "issuing justice," N.Y.Crim.Proc.L. § 700.50(2), could direct the sealing. When the tap expired, the issuing justice, Justice Schweitzer, was on vacation. After a 13-day wait, the recordings were brought to another judge who directed that they be sealed.

The failure immediately to present the tapes to the issuing justice does not require their suppression. Section 2518(8)(a) provides that in the absence of a seal the tapes might be used in evidence if "a satisfactory explanation for the absence" is made. *A fortiori,* where, as here, the tapes are sealed, a satisfactory explanation for the delay will allow their use in evidence. We are satisfied that the delay of the police in delivering the tapes for sealing was entirely excusable in the light of the wording of the New York statute. No claim is made that the tapes were altered or that the appellant was in any way prejudiced by the delay.

Affirmed.