**UNITED STATES of America,**

v.

**Joseph MASSINO and Salvatore Vitale, Defendants.**

**No. SSS 81 Cr. 803(RWS).**

United States District Court, S.D. New York.

April 12, 1985.

Rudolph W. Giuliani, U.S. Atty. for S.D. New York, New York City (Warren Neil Eggleston, Asst. U.S. Atty., New York City, of counsel), for U.S.

Hoffman, Pollok & Gasthalter, New York City (John L. Pollok, New York City, of counsel), for defendant Joseph Massino.

Slotnick & Cutler, P.C., New York City (Barry Ivan Slotnick, Bruce Cutler, Jill G. Okun, New York City, of counsel), for defendant Salvatore Vitale.

Stanley A. Teitler, P.C., New York City (Stanley A. Teitler, Amy Adelson, Richard H. Levenson, New York City, of counsel), Special Counsel to defendant Salvatore Vitale.

## OPINION

SWEET, District Judge.

Defendants Joseph Massino ("Massino") and Salvatore Vitale ("Vitale") have brought motions to suppress evidence obtained through electronic surveillance, to strike the indictment as insufficient as a matter of law, to obtain *in camera* inspection of grand jury minutes, to obtain discovery, and to obtain certain other relief. The motion to suppress the tapes for failure to seal as required is granted with respect to one of the six orders, and the motion for a bill of particulars is granted with respect to one demand. As set forth below, the remaining motions are denied.

**Prior Proceedings**

On November 23, 1981 an indictment was filed against Dominick Napolitano, Benjamin Ruggiero, Nicholas Santora, John Cerasani, James Episcopia, and Antonio Tomasulo (81 Cr. 803). A superseding indictment was filed on March 25, 1982, S 81 Cr. 803, adding Joseph Massino, Vincent Piteo, Vincent Lopez, Anthony Rabito, and Dennis Mulligan as defendants. A bench warrant was issued for Massino on March 25, 1982, but he remained a fugitive until his surrender on July 9, 1984. A second superseding indictment, with the same defendants, was filed on July 7, 1982, SS 81 Cr. 803.

A trial against the defendants named in the second superseding indictment, other than Massino, commenced on July 28, 1982, and on August 27, 1982 a jury returned guilty verdicts against Ruggiero, Santora, Rabito and Tomasulo. The Second Circuit affirmed the convictions except with respect to Tomasulo and one count of Santora's conviction. *United States v. Ruggiero,* 726 F.2d 913 (2d Cir.1984).

On October 4, 1984 the grand jury returned a third superseding indictment against Massino and added Vitale as a defendant. SSS 81 Cr. 803. This indictment and the evidence the government plans to use at trial are the targets of the motions brought by Massino and Vitale.

**Facts**

**A. Electronic Surveillance**

At trial the government intends to introduce the fruits of electronic surveillance obtained pursuant to six court orders which are referred to below as the first through sixth orders in their chronological sequence. To establish the probable cause necessary to obtain each order authorizing this electronic surveillance, 18 U.S.C. 2518(3), the government submitted an affidavit of Special Agent Donald McCormick of the FBI to the issuing judge. These affidavits alleged that Angelo Ruggiero was a member of the Gambino Family of La Cosa Nostra and that he and the other named subjects were engaged in RICO violations including extortionate credit transactions, gambling, narcotics violations, and murder. Massino and Vitale have challenged the sufficiency of the November 9, 1981 and December 29, 1981 affidavits, supporting Orders #1 and #2, and consequently have also challenged the subsequent affidavits and orders, which are derivative of these first two.

In the November 9 affidavit, McCormick alleged that Ruggiero was a member of the Gambino organized crime family, reporting directly to John Giotti, a "Capo." Along with other associates, Ruggiero and Giotti were alleged to engage in shylocking, gambling, and extortion "as part of the ongoing conduct of criminal activity by the Gambino crime family." Five confidential sources, whose knowledge was allegedly based upon the statements and admissions of Ruggiero and his associates, provided the information contained in McCormick's affidavit.

The December 29, 1981 affidavit was based upon the prior affidavit, upon additional information from four of the five confidential sources, and upon information obtained through execution of the first sur-

veillance order. The December 29 affidavit alleged Ruggiero's continued involvement in gambling and loansharking activities, the use of Ruggiero's telephones at his Cedarhurst residence in connection with the commission of these activities, and Ruggiero's close association with leaders and associates in the Gambino family.

The first order authorizing electronic surveillance was signed on November 9, 1981, by the Honorable Henry Bramwell, E.D.N.Y., and authorized a wiretap on the home telephone of Angelo Ruggiero in Howard Beach, Queens. The order authorized the tap for a period of thirty days and authorized the interception of wire communications of Angelo Ruggiero, John Giotti, Eugene Giotti, Frank Guidice, and Jackie Cavallo. This tap was terminated on December 1, 1981 when Ruggiero moved to Cedarhurst, New York. The tapes of this surveillance were sealed on December 2, 1981.

A second order, signed December 29, 1981, by the Honorable Joseph McLaughlin, E.D.N.Y., authorized the interception of the wire communication of Angelo Ruggiero, John Giotti, and Eugene Giotti over two telephones located at Ruggiero's new residence. Monitoring pursuant to this order terminated on January 28, and the tapes of this surveillance were sealed on March 11, 1982.

On February 4, 1982, the Honorable Henry Bramwell, E.D.N.Y., signed a third order, authorizing the surveillance permitted in Order #2 for thirty additional days. Interception began on February 4, 1982 and terminated on March 6, 1982. The tapes from this surveillance were sealed on March 11, 1982.

On April 5, 1982, the Honorable Henry Bramwell, E.D.N.Y., signed a fourth order, authorizing the interception of the telephone and oral communications of Ruggiero, John Giotti, Eugene Giotti, and John Carneglia at Ruggiero's Cedarhurst home. Telephone monitoring commenced on April 5, 1982, and oral intercepts began on April 8, 1982, after a "bug" was installed in Ruggiero's residence. All surveillance terminated on May 5, 1982, and the tapes from this order were sealed on May 19, 1982.

The fourth order, as had the prior three, required minimization pursuant to 18 U.S.C. 2518(5). This fourth order also stated that:

1. No device be activated and no communications be intercepted in any of the rooms unless it has been determined that at least one of the above-named subjects is present at the Ruggiero residence.
2. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise that none of the named interceptees or any of their confidants, when identified, are participants in the oral or wire conversation unless it is determined during the portion of the oral or wire conversation already overheard that this conversation is criminal in nature.
3. Even if one or more of the named interceptees or their confidants, when identified, is a participant in the oral or wire conversation, monitoring will be suspended if the oral or wire conversation is not criminal in nature or otherwise related to the offense under investigation.

On May 7, 1982, the Honorable Edward R. Neaher, E.D.N.Y., signed a fifth order, authorizing the continuance of the surveillance permitted by Order #4 until June 6, 1982. It added Edward Lind and John Conroy as permissible interceptees and incorporated the three specific limitations of Order #4 quoted above. On June 18, 1982 the tapes from this order were sealed.

On June 7, 1982 the Honorable Henry Bramwell signed the sixth and final surveillance order, authorizing continued surveillance at Ruggiero's residence as limited by the three requirements or Order #4. The named interceptees were Ruggiero, Eugene Giotti, John Carneglia, Edward Lind, Michael Coiro, and Joseph Guorliano. Monitoring was conducted from June 7, 1982 until July 7, 1982, and the tapes containing the intercepted communications were sealed on July 22, 1982.

These six orders can be summarized as follows:

| | Date of Order | Termination | Date Sealed |
|---|---|---|---|
| 1. | 11/9/81 | 12/1/81 | 12/2/81 |
| 2. | 12/29/81 | 1/28/82 | 3/11/82 |
| 3. | 2/4/82 | 3/6/82 | 3/11/82 |
| 4. | 4/6/82 | 5/5/82 | 5/19/82 |
| 5. | 5/7/82 | 6/6/82 | 6/18/82 |
| 6. | 6/7/82 | 7/7/82 | 7/22/82 |

Massino was overheard by telephone surveillance from November 1981 through March 1982. He was not intercepted over the "bug" in the Ruggiero residence. Vitale was heard over the Ruggiero telephone in November, 1981 and was heard through the "bug" on June 13, 1982. All of the conversations involving either Massino or Vitale were with Angelo Ruggiero.

## B. The Indictment

The first of the two counts in the third superseding indictment alleges that from about 1980 to the date of the indictment Massino was a "captain" of the Bonanno family of La Cosa Nostra. It alleges that at all times relevant to the indictment Massino, Vitale, and others, named and unnamed, were members or associates of the Bonanno family, and that they constituted an "enterprise," as defined by 18 U.S.C. § 1961(4). Further, Massino, Vitale and others, named and unnamed, unlawfully, knowingly and wilfully combined and conspired to violate 18 U.S.C. § 1962(d), by conspiring to participate in the affairs of the enterprise, affecting interstate commerce through a pattern of racketeering activity.

The pattern of racketeering activity included 1) Massino's involvement, from April 1981 to the date of the indictment, in conspiracies to murder Alphonse Indelicato, Philip Giaccone, Dominick Tinchera, and Anthony Indelicato, in violation of §§ 125.-25 and 105.15 of New York Penal Law; 2) Massino's and Vitale's effort, in September, 1981, willfully and knowingly to obstruct the administration of justice by endeavoring to counsel another person to avoid service of a grand jury subpoena; 3) Massino's involvement in April, 1981 in a conspiracy to rob the occupants of Galerie Des Monnaies, in violation of New York State law; 4) Massino's involvement in or about March, 1975, in a conspiracy to convert goods and chattels worth more than $100 in interstate commerce, in violation of 18 U.S.C. § 659; 5) Massino's and Vitale's involvement, in or about May, 1975, in a conspiracy to dispose of goods in interstate commerce valued at more than $5,000, knowing those goods to have been stolen and unlawfully converted in violation of 18 U.S.C. § 2315; and 6) Massino's and Vitale's involvement, in December, 1976, in a conspiracy to steal and convert for their own use goods and chattels moving in interstate commerce worth more than $100, in violation of 18 U.S.C. § 659.

Count Two alleges that Massino and Vitale, with others, named and unnamed, unlawfully, wilfully, and knowingly participated in the affairs of an enterprise which affected interstate commerce through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c). The substantive crimes alleged in Count One to be the subject of the conspiracy are realleged in Count Two as violations of § 1962(c).

## Law

### A. Electronic Surveillance

#### 1. Probable Cause

Massino and Vitale have challenged the finding of probable cause that preceded issuance of Orders #1 and #2, relying upon the derivative nature of the subsequent orders to suppress the fruits of the remaining surveillance. Electronic surveillance pursuant to 18 U.S.C. § 2510 *et seq.* is permitted only after the judge issuing the surveillance order has made three specific findings of probable cause: 1) an individual is committing, has committed, or is about to commit a particular offense enumerated in 18 U.S.C. § 2516; [1] 2) particular communications concerning that offense will be obtained through such interception; and 3) the facilities from which, or the

---

1. Massino and Vitale do not contend that the offenses alleged in the surveillance orders are not incorporated in 18 U.S.C. § 2516.

place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense. The government contends that the affidavits submitted by Special Agent Donald McCormick of the FBI in support of the applications for interception of wire communications establish the requisite probable cause.[2]

■ The standard of "probable cause" that must be met to obtain an order authorizing electronic surveillance is the same as that for issuance of a search warrant. *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied sub nom. Quinn v. United States*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Court abandoned the two-pronged analysis of evidence introduced to establish probable cause that had been required by *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and instead established instead a "totality-of-the-circumstances analysis." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. The Court explained:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband of evidence of a crime will be found in a particular place.

*Id.* A magistrate's determination of probable cause should be paid great deference, *id.* at 236, 103 S.Ct. at 2331, *United States v. Perry*, 643 F.2d 38, 50 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70

L.Ed.2d 115 (1981) and the supporting affidavits upon which the magistrate or judge relied should be viewed as a whole and in a practical, common sense fashion. *United States v. Todisco*, 667 F.2d 255, 258 (2d Cir.1981), *cert. denied*, 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982).

■ Examined by this standard, McCormick's November 9, 1981 affidavit satisfies the requirement that probable cause be demonstrated.[3] Based upon FBI files, numerous discussions with members of the New York City Police Department, and five confidential sources, McCormick concluded that Ruggiero was personally involved in ongoing criminal shylocking, gambling, and extortion activities at the Ruggiero home and discussed such activities over the telephone at his residence. *McCormick Aff.* at p. 3–4.

Excerpts of McCormick's affidavit demonstrate not only that there was probable cause to believe there were continuing violations but also that the confidential sources possessed sufficient detail and understanding of the underlying circumstances upon which to form a legitimate judgment:

> (Confidential Source ("CS") 1) Ruggiero regularly discussed shylocking and gambling matters with CS–1 ... CS–1 is informed by an active member of the John Giotti crime crew that Ruggiero is still active in extending shylocking loans and is also heavily involved in illegal numbers and sports bookmaking operations (see ¶ 7 of 11/9/81 affidavit);
>
> (CS–2) Ruggiero "has discussed his ... currently active sports bookmaking, gambling and numbers operations" with CS–2, disclosing his partnership with Eugene and John Giotti; furthermore, CS–2 has been informed by Ruggiero that "Frankie the Beard, true name Frank

---

**2.** At oral argument counsel for Vitale raised for the first time an issue relating to an allegedly illegal state tap on Ruggiero's phone that preceded the federal surveillance and provided the basis for the information used by the government to establish probable cause for the federal taps. No formal papers were submitted and the issue is considered waived at this time.

**3.** The rule of *Illinois v. Gates* is applicable to this case. *See United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Even if the *Aguillar* and *Spinelli* tests were applied, moreover, probable cause would be readily demonstrated.

Guidice" manages the gambling operations, which does $70,000 to $150,000 a day in gross receipts. Ruggiero has also discussed his loansharking business with CS-2 (see ¶ 9–10 of 11/9/81 affidavit); (CS-3) A loanshark victim, CS-3, had taken out a loan through Eugene Giotti with collections being made by Peter Giotti or Jackie Cavallo; other loansharking victims have informed CS-3 that Ruggiero is partners with Eugene and John Giotti in his loan and that "missed payments would result in violence to the delinquent party"; CS-3 learned directly from Ruggiero that a "shylock victim identified as Vinny Cous' ... had borrowed a large amount of money, made a few payments, and left. Angelo Ruggiero informed the source he was not interested in repayment, but would kill "Vinny Cous' if he found him." (See ¶¶ 14–15 of 11/9/81 affidavit); (CS-4) "CS-4 has heard Angelo Ruggiero discuss [his] currently active bookmaking and numbers operation with other members of the John Giotti crime crew ... CS-4 has [also] overheard Angelo Ruggiero attempting to collect extortionate loans from unknown loanshark victims" (see ¶ 18 of 11/9/81 affidaviit); and (CS-5) CS-5 learned about Ruggiero's loansharking and gambling activities from Ruggiero himself (see ¶ 22–23 of 11/9/81 affidavit). The reliability of these sources is buttressed by the independent corroboration of other sources, *United States v. Harris*, 403 U.S. 573, 581, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971) (Opinion of Durper, C.J.); *United States v. DePalma*, 461 F.Supp. 800, 808 (S.D.N.Y.1978) and by the past record of the confidential sources as attested to by McCormick in producing arrests and seizures of contraband. *See* Aff. ¶ s 8, 12, 16, 20, and 24.

■ Upon this record there was probable cause to believe that communications relating to gambling, loansharking, and extortionate activities would be obtained through monitoring the telephone at Ruggiero's premises. 18 U.S.C. §§ 2518(3)(b) and 2518(3)(d). Despite defendants' asser-

tions, there is simply no requirement that surveillance be denied until it is shown that the telephone to be tapped was a *"vital instrument"* in the alleged unlawful activities. (Def's Mem. of Law at p. 79). The statutory mandate is that communications concerning the offense will be obtained and that the facilities from which the interception will be made is being used in connection with the offense. 18 U.S.C. § 2518(3)(b) & (d).

■ The December 29 affidavit, when examined "as a whole" and "in a common sense realistic fashion," *United States v. Hillard*, 701 F.2d 1052, 1062 (2d Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983), also establishes probable cause. The affidavit relied upon information discovered as a consequence of the first order and additional information provided by four of the five confidential sources who were the basis of the November 9 affidavit. These sources establish probable cause to believe that Ruggiero continued to be involved in gambling and loansharking operations, that Ruggiero continued to use the telephones at his residence to commit such activities, and that Ruggiero's involvement in the Gambino family was continuing. Even though defendants propose innocent explanations for several of the conversations relied upon in the affidavit, the role of a reviewing court in examining the existence of probable cause is not to seek proof beyond a reasonable doubt of involvement in the alleged activity. Not only must the experience of an expert affiant in examining evidence which might appear non-incriminating to a lay person be given certain defference, *see Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (Powell, J., concurring), but:

> ... courts have long recognized that in the context of eavesdroping, an otherwise ambiguous conversation may serve as a predicate for probable cause so long as it is reasonably interpreted. *United States v. Aloi*, 449 F.Supp. 698, 736 (E.D. N.Y.1977).

On this record, I conclude that probable cause existed for both the November 9, 1984 and December 29, 1984 orders.

### 2. Alternative Investigative Techniques

Section 2518(3)(c) requires that a judge, prior to authorizing a wire interception, must conclude that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." Massino and Vitale attack this finding in each of the six orders. *See* ¶ (c) of Orders 1, 2, 3 and ¶ (d) of Orders 4, 5, 6.

■ The requirement of § 2518(3)(c) must be interpreted in a "practical and commonsense fashion" so that it does not "foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Fury, supra,* at 530. The statute is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). Further, "more traditional surveillance techniques need not be exhausted first if they are 'impractical' or 'costly and inconvenient.'" *United States v. Fury, supra,* at 530 n. 7, *quoting United States v. Robertson,* 504 F.2d 289, 293 (5th Cir. 1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975). *See United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir.1984); *United States v. Todisco, supra,* at 258–59. Again, substantial deference must be given to the issuing judge's evaluation that the application was sufficient. *See United States v. Ruggiero, supra,* at 923–24; *United States v. Jackstadt,* 617 F.2d 12, 13 (2d Cir.), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).

■ Applying these principles, I conclude that the statutory requirement was satisfied. McCormick's affidavits demonstrate the hazards and uncertainty of other investigative techniques. The confidential sources refused to testify even with grants of immunity, for fear of risks to themselves and their families. McCormick Aff.,

Nov. 9, 1981 at ¶ 27(a); Dec. 29, 1981 at ¶ 17; aff. of Feb. 4, 1982 at ¶ 10(a). The confidential sources were, additionally, unable to penetrate the inner circles of the Ruggiero crew. McCormick aff., April 5, 1982 at ¶ 14(a); May 7, 1982 at ¶ 26(a), June 7, 1982 at ¶ 38(a).

Physical surveillance has a limited ability to define the precise nature of transactions, and the use of search warrants or investigative grand juries would, by publicizing the investigation, jeopardize the ability to delve deeper into the organization. While a pen register has certain utility, it too is obviously more limited in the information it will yield. *United States v. Shakur,* 560 F.Supp. 318, 326 (S.D.N.Y.1983).

The use of electronic surveillance has been consistently approved under circumstances similar to those alleged in this case, where tightly knit complex crime organizations are the target of investigation. *See United States v. Vazquez,* 605 F.2d 1269, 1282 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Fury, supra,* at 530. Although the defendants urge that the government should have used undercover agents who could infiltrate the target organization, no authority has required the government to assume the risks of such a technique, and I decline to do so.

The defendants' reliance on *United States v. Lilla,* 699 F.2d 99 (2d Cir.1983) is also unavailing. In that case, the affidavit merely asserted that alternative investigative techniques would be unavailing, without explaining the conclusory nature of the assertion. Moreover, to the extent other investigative techniques had been used, they had been successful in that "small time narcotics case." *Lilla supra,* at 104; *United States v. Shipp,* 578 F.Supp. 980, 989 (S.D.N.Y.1984). I conclude that the affidavits of McCormick satisfactorily establish that normal investigative procedures had been used to the extent reasonably likely to succeed and that such ordinary procedures were unlikely to produce additional success.

### 3. Compliance with Minimization Requirements

Massino and Vitale have challenged the admissibility of any intercepts during April, May, and June, 1982, arguing that during this period the government failed to minimize its interceptions as required by either 18 U.S.C. § 2518(5) or by the specific minimization requirements in the April, May, and June orders, quoted *supra*. Before reaching the issue of compliance with the minimization requirement or the relevant court order's particular procedures, the defendants must establish standing to address this issue. The government has stated its intentions to introduce only one conversation from this period: a June 13 conversation between Vitale and Ruggiero inside Ruggiero's residence. The monitoring of this conversation is conceded by defendants not to violate any minimization requirement. Massino and Vitale thus seek to strike the introduction of this conversation because the government's other monitoring of Ruggiero's house and telephone during this time period did not conform to the statute or the court's order.

Although the defendants are aggrieved persons within the meaning of the statute, 28 U.S.C. § 2510(11), this status does not give them an unlimited right to enforce minimization requirements where they do not possess independent privacy rights in the phone tapped. The Second Circuit has squarely confronted this issue, and in both *United States v. Fury, supra*, at 526, and *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) concluded that only one with a privacy interest in the tapped phone or house can raise the general failure to minimize as a bar to introduction of concededly appropriate interceptions. "Fury, on the other hand, has standing as an aggrieved person to challenge both the Schnell and Fury wiretaps ... Fury does not have standing, however, to raise the issue of improper 'minimization' during the Schnell tap. That is because the tap on Schnell's phone and the failure to minimize the conversations intercepted is an invasion of Schnell's privacy, not Fury's." *Fury, supra*, at 526,

citing *Poeta, supra; Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), *United States v. Hinton*, 543 F.2d 1002, 1011 n. 13 (2d Cir.1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783 (1977). *See also United States v. Ramsey*, 503 F.2d 524, 532 (7th Cir.1974) (Stevens, J.) (adopting Second Circuit view of standing to raise minimization challenge, but extending a privacy interest to members of the telephone subscriber's family.)

Massino and Vitale respond, however, that this case is distinguishable because the minimization requirements were memorialized in the order authorizing the surveillance and any violation of the minimization requirement therefore became a violation of the authorizing order to which any aggrieved party may object. This argument fails because the statutory minimization requirement is a necessary concomitant of every surveillance order. 28 U.S.C. § 2518(5). Assuming the greater precision of a minimization requirement in the order at issue, the more stringent requirements do not confer additional rights upon those with no privacy interest in the place of surveillance. This Circuit has held consistently that a minimization claim, whether based upon § 2518(5) or the order itself, may be raised only by one with a privacy interest in the place of surveillance. *Fury, supra; Poeta, supra*. Merely being an aggrieved party does not confer standing to raise a challenge based on minimization.

### 4. Sealing

Massino and Vitale also claim that the tapes of surveillance were not sealed "immediately" as required by 18 U.S.C. § 2518(8)(a). The statute states: "Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." *Id*. The purpose of this judicial scrutiny throughout the entire process of interception to insure the accuracy of the tapes and to prevent the risk of any tampering or distortion of such powerful evidence. *See generally United States*

*v. Gigante,* 538 F.2d 502, 505 (2d Cir.1976); *United States v. Vasquez,* 605 F.2d 1269 (2d Cir.1979). Where sealing is not immediate, the tapes of surveillance will be suppressed if a "satisfactory explanation" for the delay is not provided. *Gigante, supra; United States v. McGrath,* 622 F.2d 36, 42 (2d Cir.1980). Although not determinative of the justification for delay, factors which have been cited include the length of the delay, *Vazquez, supra; United States v. Scafidi,* 564 F.2d 633, 641 (2d Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); evidence of tampering, *Vazquez, supra; Poeta, supra;* the time required to prepare the tapes for sealing, *United States v. Ricco,* 421 F.Supp. 401, 408 (S.D.N.Y.1976), *aff'd,* 566 F.2d 433 (2d Cir.1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978); and whether the defendants were prejudiced by the delay, *Scafidi, supra; McGrath, supra.* There is an affirmative and heavy burden on the government to establish the sufficiency of the explanation for any delay. *McGrath, supra; Vazquez, supra.*

The government and defendants disagree both as to the length of the delays involved here and the justification for those delays. The chart below provides a summary of the relevant parties and delays:

| | PARTIES | OFFENSES | BEGUN | ENDED | SEALED |
|---|---|---|---|---|---|
| 1. | Angelo Ruggiero John Giotti Frank Guidice Jackie Cavallo | 18 U.S.C. 371, 892, 894, 1955(a), 1962(c) | 11/9/81 | 12/1/81 | 12/2/81 |
| 2. | Angelo Ruggiero John Giotti Eugene Giotti | 18 U.S.C. 371, 892, 894, 1955(a), 1962(c) | 2/4/82 | 3/6/82 | 3/11/82 |
| 3. | Angelo Ruggiero John Giotti Eugene Giotti | 18 U.S.C. 371, 892, 894, 1955(a), 1962(c) | 2/4/82 | 3/6/82 | 3/11/82 |
| 4. | Angelo Ruggiero Eugene Giotti John Carneglia John Giotti | 18 U.S.C. 371, 892, 894, 1955(a), 1962(c), 21 U.S.C. 846, 841 | 4/5/82 | 5/5/82 | 5/19/82 |
| 5. | Angelo Ruggiero John Giotti Eugene Giotti John Carneglia Edward Lind John Conroy | 18 U.S.C. 371, 892, 894, 1510, 1955(a), 1962(c), 21 U.S.C. 841, 846, 100.10, 105.15, 125.25 Penal Law of the State of New York | 5/7/82 | 6/6/82 | 6/18/82 |
| 6. | Angelo Ruggiero Eugene Giotti John Carneglia Edward Lind Michael Lind Joseph Gugliano | 18 U.S.C. 371, 892, 894, 1510, 1955(a), 1962(c), 21 U.S.C. 841, 846, 100.10, 105.15, 125.25 Penal Law of the State of New York | 6/7/82 | 7/7/82 | 7/22/82 |

There is no dispute with respect to the sealing of tapes from the first order. The defendants do not argue that the one day delay is violative of the statute. With respect to the other orders the timeliness of the sealing of the tapes is at issue.

The government contends that the remaining five orders constitute one order with successive extensions, as permitted by 28 U.S.C. § 2518(8)(a), and therefore that the only gap that must be discussed is that from July 7 until July 22. Massino and Vitale assert that each of the remaining five orders was independent, and that delays of 42, 5, 14, 12 and 15 days must be justified.

The standard for defining an extension of an order, which eliminates the necessity of immediate sealing of the prior order's fruits, as opposed to a distinct order, which does not provide the basis for such a delay, has been addressed by this Circuit. In *United States v. Vazquez, supra,* the Court stated:

> We interpret the phrase "period of the order, or extensions thereof," in the sealing provision of the federal statute, § 2518(8)(a), to encompass a continuous authorized wiretap in its entirety, regardless of whether the judicial orders authorizing the initiation or continuation of the tap are denominated "orders," "extensions," "renewals," or "continuations."
>
> [W]e conclude that the term "extensions" ... is to be understood in a common sense fashion as encompassing all consecutive continuations of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same crimes, and substantially the same persons. *See United States v. Scafidi, supra ...*

▉ Massino and Vitale rely heavily on Vazquez's use of the phrase "continuous" surveillance to argue that the gaps between the successive orders in this case forbid viewing the subsequent orders as extensions. However, in *United States v. Gigante, supra,* the court suppressed the fruits of six orders where the delays in sealing ranged from 8 months to nearly 13 months. The court remanded, however, to determine whether an order signed December 8 could be viewed as an extension of an order that expired on November 24. *Id.* at 507. The mere fact of a gap between the two orders did not foreclose viewing the second order as an extension. And in *United States v. Scafidi, supra,* relied on in *Vazquez,* the Court expressly held that the existence of gaps between an original order and subsequent orders did not prevent viewing the subsequent order as an extension. *Scafidi* at 637, 641. The identity of targets, crimes, and phones tapped, not the fact of a delay between orders, is determinative.

▉ I conclude that the third order should be viewed as an extension of the second, and the sixth and fifth extensions of the fourth. This creates sealing gaps of five days subsequent to the third order, fourteen days subsequent to the fourth order, and fifteen days subsequent to the sixth order. The second and third orders have an identity of crimes and targets, and the orders involved identical surveillance techniques. The fourth order is distinct not only because it was authorized a full month subsequent to expiration of the third order, but because it authorized the installation of a bug to overhear oral, non-wire communications, and added additional targets and crimes. Similarly the fifth and sixth orders should be viewed as extensions of the fourth order. The targets and crimes are essentially the same; the mechanism for interception and places of interception identical; and the fourth order followed the expiration of the third order by only two days.

Gaps of five days and fifteen days therefore exist between the termination of the third and fourth orders and the sealing of the tapes obtained pursuant to those orders and the extensions thereof. The government, in order to avoid suppression of tapes where sealing has not been immediate, has an affirmative obligation to provide a satisfactory explanation for the delay. *United States v. Gigante, supra,* at 506. Although the Second Circuit has excused delays of thirteen days where "we discern on the government's part no bad faith, no lack of diligence, and no attempt to gain an advantage over the defendants" *Vazquez, supra,* at 1279, "section 2518 was not intended to bar use of the wiretaps only when the defendant can show prejudice or present evidence of tampering or other governmental bad faith." *United States v. McGrath,* 622 F.2d 36, 43 (2d Cir.1980).

Some courts have interpreted the necessity of a satisfactory explanation as nothing more than a showing that the integrity of the tapes has not been violated. *See United States v. Diana,* 605 F.2d 1307, 1314 (4th Cir.1979). I read the Second Circuit

cases, however, as accepting as legitimate only those delays that are a result of the administrative process of preparation of the tapes for sealing. In *United States v. McGrath, supra,* the court accepted as an explanation for delays of three and eight days that "it was 'reasonably necessary' to transport the tapes from Binghamton to Albany for duplication and processing, and thence to Auburn for sealing." *Id.* at 43. Similarly, in *United States v. Vazquez, supra,* the court examined the shortages in government personnel, the frequent failure of the machinery being used, and the fact that over 200 reels of tape required duplicating, labeling and checking, in concluding that "although the question is close, in our view the circumstances just detailed provide a satisfactory explanation for the 7 to 13 day sealing delays." *Id.* at 1279. And in *United States v. Poeta, supra,* the court excused a thirteen day delay where confusion with respect to New York law led the investigating authorities to believe that only the judge who had authorized the surveillance, and who was on vacation at the time, could seal the tapes. In *United States v. Fury, supra,* the court held that a six day delay was justified where the District Attorney's efforts to have the issuing State Justice seal the tapes were stymied by the Justice's vacation. *Id.* at 533. I am mindful of the 42 and 24 day lapses permitted in *United States v. Caruso,* 415 F.Supp. 847, 850–851 (S.D.N.Y.1976), *aff'd without opinion* 553 F.2d 94 (2d Cir.1977). I note, however, that the 24 day delay was a result, at least in part, of "delays encountered by the efforts of the Police to ready the tapes for sealing and to duplicate the Social Club tapes ..." and that the 42 day delay was caused primarily by the hospitalization of the Assistant District Attorney handling the case, and the transfer of the case to another assistant who had the tapes sealed immediately upon discovering the lapse. I consider these to be essentially "administrative" mishaps. Moreover, "[a]s the federal and state case law in this area grows, the failure to foresee and, where possible, prevent sealing delays becomes less justifiable, as law enforcement officials must be expected to learn from their own experiences and those of others." *United States v. Vazquez, supra,* at 1280.

 Although the courts have shown latitude in permitting satisfaction of the "sufficient explanation" standard, the courts have relied in each case on some effort by the government to satisfy the "immediate" sealing requirement. Mere disregard of the statute while pursuing other investigative efforts is not sufficient, and acceptance of such an explanation would violate the clear meaning of the statute and the purposes of the Congress underlying the strict guidelines in Title III.

 The delay involved in the sealing of the tapes from orders two and three was attributable, according to FBI Agent McCormick, to

> normal administrative procedures required before submission of the "original tapes" to the court for sealing; for example, review of the duplicate tapes made from the four originals produced Friday and Saturday, March 5th and 6th, to ensure proper reproduction or to determine the necessity for quality enhancement; comparison of duplicate recordings with the monitoring logs; inventory originals and ensure duplicates available; maintain chain of custody by checking original for proper identifying data (e.g., agent's initials, date of tape, classification number, correct tape in correct box); coordinate transportation of tapes to court with schedules of the supervising attorney and issuing judge. *McCormick Aff.* at p. 8.

These reasons are within the administrative justifications that I consider permissible. Consequently, the delay in sealing the tapes from the second and third orders is acceptable.

 Agent McCormick's affidavit explains the delay of fifteen days in sealing the tapes from the sixth order as follows:

> 6. The sealing delay of fifteen (15) days following the conclusion of the electronic surveillance resulted primarily from the necessity of conducting an immediate, sensitive and comprehensive in-

vestigation into a "leak" of information concerning the Title III microphone investigation of Ruggiero and his associates. On July 6, 1982, the FBI learned that Angelo Ruggiero had received confidential information contained within the supporting affidavit of our Title III electronic surveillance inside his residence. Immediately, the FBI began an extensive obstruction of justice investigation utilizing all available manpower to determine the source or "leak" of this confidential information. Our major concern was not only with the potential harm to our wiretap and eavesdropping investigation, but with the possible compromising of other sensitive investigations by this unknown and unidentified source. Concurrent with our "leak" investigation, we were responsible for our attendant duties of planning and executing a search warrant for Ruggiero's residence, closing down and securing the monitoring plant and facilities, and completing our required administrative responsibilities in preparation for sealing (see paragraph 10 *supra*). The following is a review of our efforts to uncover the "leak" during the period prior to the sealing of the tapes on July 22, 1982: (a) a concerted effort by members of our Gambino organized crime squad to contact confidential sources in an effort to learn additional information regarding the "leak;" (b) we conducted a thorough review of voluminous toll records and pen register data from instruments utilized by Ruggiero and his associates; (c) examined available information to identify suitable subjects for continued electronic surveillance; (d) made a complete and comprehensive account of all related eavesdropping documents, including copies and originals of court orders, applications, supporting affidavits, and ancillary records (i.e., periodic reports), both sealed and otherwise, within the possession of the FBI, United States Attorney's Offices, and the District Court; (e) identified all individuals who had access to the above documents within said offices; (f) submitted all accumulated records referred to in paragraph (g) above, to the FBI latent Fingerprint Sections for analysis, (h) conducted an exhaustive review of the intercepted taped conversations and monitoring logs prepared during the wiretap investigation in order to possibly identify the defendants' contact in law enforcement or governmental agencies; (i) maintained periodic surveillances of the defendants and their associates in order to hopefully identify the "leak" or possible contact; and (j) held a series of lengthy conferences within the FBI, in conjunction with the United States Attorneys Office and Department of Justice Organized Crime strike Force, to access the damage the "leak" caused, and potentially could cause, to present and future investigations, as well as ascertaining the direction of FBI law enforcement efforts. *McCormick Aff.* at pp. 9–11.

Accepting, as I do, for the purposes of this motion, the assertions of Agent McCormick, I do not consider these reasons to constitute a reasonably necessary delay. Although the concerns of the FBI were legitimate, the affidavit makes it evident that the FBI consciously chose to pursue additional investigatory avenues, including surveillance of the defendants and their associates. There is no allegation of an administrative or mechanical difficulty or an inability to accomplish the sealing. The statutory mandate that the fruits of Title III surveillance be sealed immediately is not satisfied by the need for further investigation, unrelated to the administrative requirements involved in sealing the tapes. The statute is denied any meaning if justifications unrelated to problems inherent in the sealing of the tapes can excuse delays in sealing. The fruits of the final order are suppressed. The products of the fourth and fifth orders were sealed before the expiration of the sixth order and so are admissible.

### 5. Suppression of Rabito Tapes

Massino has moved to suppress the fruits of the surveillance of Anthony Rabito. This motion was denied earlier and is denied again for the reasons then stated.

*See United States v. Napolitano,* 552 F.Supp. 465, 474–77 (S.D.N.Y.1982), *aff'd, United States v. Ruggiero,* 726 F.2d 913 (2d Cir.1984).

## B. Sufficiency of the Indictment

### 1. Inspection of Grand Jury Minutes

Massino and Vitale have moved, relying on *United States v. Estepa,* 471 F.2d 1132 (2d Cir.1972) for an *in camera* inspection of the grand jury minutes to determine whether the third superseding indictment was based on hearsay or other "shoddy merchandise." Defendants accept as a premise that the government at the trial in *United States v. Napolitano,* and in the subsequent appeal of that case, presented all the legitimate evidence it possessed relevant to the current indictment and that this evidence would be insufficient to support the third superseding indictment. Therefore, they conclude that this indictment can be supported only by "shoddy merchandise." They do not allege, however, that the grand jury relied *only* on hearsay evidence or that there were specific identifiable instances of prosecutorial misconduct.

*Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) place a heavy burden on a defendant attempting to acquire access to grand jury minutes or to force an *in camera* inspection of those minutes. "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial on the merits." *Id.* at 363, 76 S.Ct. at 408. *See also United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974)("Thus an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence.")

Decisions in this Circuit since *Estepa, supra,* have held squarely that an indictment valid on its face may not be challenged merely by an assertion that hearsay evidence was the basis for the indictment. *United States v. Schlesinger,* 598 F.2d 722, 726 (2d Cir.), *cert. denied,* 444 U.S. 880, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979); *United States v. Blitz,* 533 F.2d 1329, 1344 (2d Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976); *United States v. Wilson,* 565 F.Supp. 1416, 1436 (S.D.N.Y. 1983).

 Massino and Vitale have presented only speculation with respect to the nature of the evidence presented to the grand jury. As the Honorable Edward Weinfeld stated:

> [N]o factual matter has been presented on this application to warrant intrusion into the secrecy of the grand jury process. Counsel's unsupported view that abuses may have occurred ... is insufficient to overcome the presumption of regularity of the grand jury proceedings and does not justify disturbing the traditional secrecy surrounding such proceedings. Speculation and surmise as to what occurred ... is not a substitute for fact.

*Id.* at 1436. *United States v. Hogan,* 712 F.2d 757 (2d Cir.1983) is notably different in this regard. There, facts of specific abuse by the prosecutor were the basis for the reversal of the convictions.

Further, Massino and Vitale have no basis for their conclusion that no facts other than those presented at the *Napolitano* trial were presented to the grand jury. The government may have continued its investigation in the interim and produced additional facts for presentation to the grand jury. Finally, to grant Massino's motion would effectively reward him for his fleeing justice subsequent to his indictment in March, 1982. Only because he was a fugitive and avoided the first trial can he now assert that the facts available to the government and the grand jury were insufficient. Massino as a result of the first trial is already the beneficiary of discovery usually unavailable to a defendant. He now hopes to use this discovery as a wedge for opening the grand jury minutes. The motion is denied.

### 2. Sufficiency of the Murder and Obstruction of Justice Predicates

 The defendants have also moved to strike the murder and obstruction

of justice predicates, arguing that the facts which the defendants assume will be presented at trial are insufficient to support a conviction. These motions do not challenge the facial validity of the indictment, *see*, Fed.R.Cr.P. 12(b)(2), but rather attempt to bring a motion pursuant to Fed. R.Cr.P. 29 before the government has presented its case. The motions are therefore premature and must be denied. *See United States v. Shakur*, 560 F.Supp. 366, 371 (S.D.N.Y.1983); *United States v. Cafaro*, 480 F.Supp. 511, 520 (S.D.N.Y.1979). A motion to dismiss for insufficient evidence can be decided only at trial, after the government has been put to its test, not before trial, based merely on assumptions of what the government's proof will be. The motions are denied, and the court will also decline, at this time, to define the necessary elements of murder under New York Penal Law §§ 125.25 and 105.15, or determine the requisites of obstruction of justice under 18 U.S.C. § 1503, or define the necessity that a defendant have committed a predicate act within the five year statute of limitations to support a conviction under a RICO conspiracy count. 18 U.S.C. § 1962(d).

### 3. Motion to Strike Surplusage from Indictment

Defendants have moved to strike all references in the indictment to the "Bonanno Family," "La Cosa Nostra," "Boss," "Crews," and "Captains." This motion has been previously denied and is denied again for the reasons stated in *United States v. Napolitano*, 552 F.Supp. 465, 480 (S.D.N.Y. 1982)(RWS).

### C. Discovery

#### 1. The Telephone Book

Massino has moved pursuant to Fed.R. Cr.P. 16(a)(1)(d) for an order permitting inspection of a telephone book seized from him on March 11, 1975. Massino's inspection of the book will be permitted in the presence of a government agent, thereby insuring the integrity of the document.

### 2. Brady Material

The defendants have moved pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) for an order requiring the government to furnish the defendants, forthwith, with any exculpatory information either within the knowledge of the government or which should be within its knowledge through the exercise of due diligence. The government asserts that it has already complied with its obligations under *Brady* and will seek a court ruling in the event of any ambiguity with respect to its obligations. Recognizing the difficulties in expecting the government to analyze its evidence from a defense perspective, I accept the government's representation that it has complied with its obligations under *Brady*. *See United States v. Mitchell*, 372 F.Supp. 1239, 1257 (S.D.N.Y.1973). Information bearing on a witness' credibility, such as grants or promises of immunity, plea bargain arrangements, or other consideration promised by the government in return for testimony must be turned over at the same time as other 18 U.S.C. § 3500 materials.

The defense request for the names of any individuals whom the government believes may have knowledge of the charges is denied to the extent that it exceeds the scope of *Brady*. The information is sought irrespective of whether it is exculpatory, and its disclosure would amount to an excessive pretrial display of the government's investigative file.

### 3. Bill of Particulars

The defendants have presented thirty-six requests for particular information regarding the indictment. These requests can be divided into four categories: 1) requests to state whether the defendants acted as principals or aiders and abettors (requests 21, 23 and 25); 2) requests to state who, in addition to the named defendants and listed individuals were the defendants co-conspirators (requests 1, 2, 3, 5, 6, 7, 8, 11, 12, 15, 16, 18, 20, 22, 24, 26, 29, 31, 33, and 25); 3)

requests to state where, in addition to the locations listed in the indictment, the defendants violated the statute (requests 4, 9, 10, 13, 14, 17, 19, 27, 30, 32, 34 and 36); and 4) a request to state the name of the person whom Massino is alleged to have corruptly endeavored to counsel to avoid service of a grand jury subpoena (request 28).

■■■■■ A motion for a bill of particulars is directed to the discretion of the court. *Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Salazar,* 485 F.2d 1272, 1278 (2d Cir.1973), *cert.* denied, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). A bill of particulars is meant to apprise the defendant of the essential facts of a crime and should be required only where the "charges of an indictment are so general that they do not advise a defendant of the specific acts of which he is accused." *United States v. Leonelli,* 428 F.Supp. 880, 882 (S.D.N.Y.1977). A bill of particulars is not an investigative tool which a defendant can use to force the government to preview its evidence or expose its legal theory. *United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974). *See United States v. Wilson,* 565 F.Supp. 1416, 1439 (S.D.N.Y. 1983) and cases cited therein. Because a bill of particulars confines the government's proof to the particulars furnished, *United States v. Glaze,* 313 F.2d 757, 759 (2d Cir.1963) requests for bills of particulars should not be granted where the consequence of granting the request would be to restrict unduly the government's ability to present its case.

■■■■■ The first category of requests is denied. "The government need not specify which defendants are charged as principals and which as aiders and abettors, since this would reveal the government's theory underlying those counts ..." *United States v. Mannino,* 480 F.Supp. 1182, 1185 (S.D.N.Y.1979). With respect to the second category of requests, the government has consented to provide the defend-

ants, prior to trial, with a list of all co-conspirators with the named defendants and named individuals in counts 1 and 2 who are known to the government. This satisfies the obligation of the government. The third category of requests, for the location of each alleged violation, is denied. The information already made available to the defendants is sufficient to enable proper preparation for trial, and further discovery would amount to unnecessary revelation of evidence. *United States v. Wilson, supra,* at 1438–39. The final request, for the name of the person whom Messino is alleged to have corruptly endeavored to counsel to avoid service of a grand jury subpoena, is granted.

### D. Severance

■■■ Vitale has moved pursuant to Fed. R.Cr.P. 14 for a severance of his trial from that of Massino. This motion is directed to the discretion of the court, *Opper v. United States,* 348 U.S. 84, 85, 95, 75 S.Ct. 158, 160, 165, 99 L.Ed. 101 (1954); *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.1984), and a defendant has a "heavy burden" *United States v. Sotomayor,* 592 F.2d 1219, 1227 (2d Cir.), *cert.* denied, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979) on such a motion. In *United States v. Napolitano,* I held that "separate trials are not required when evidence may be admissible against the defendant but not against others... Additionally, when the crime involves a scheme, plan or enterprise, joint trials are appropriate... Differences as to nature, degree and quantity do not preclude a joint trial ... The evidentiary spillover which concerns the defendants will be avoided by this court's instructions to the jury." *Id.* at 479 (citations omitted). The defendants are alleged co-conspirators in a complex RICO conspiracy, and Vitale is alleged to be involved throughout the course of the conspiracy. I conclude that the risk of prejudice can be eliminated through the use of limiting jury instructions and that the conscientious efforts of

the jury to consider the defendants separately will preclude the risk of spillover. I deny the motion for a severance.

## Conclusion

The motions seeking exclusion of the fruits of the electronic surveillance are denied with respect to the first five surveillance orders and granted with respect to the sixth order. The defendants' motion seeking a bill of particulars is granted only with respect to disclosure of the name of the individual allegedly told to avoid service of a grand jury subpoena.

IT IS SO ORDERED.