**UNITED STATES of America**

v.

**Mike RODRIGUEZ, Jr., William Donlan, Anthony Vessichio, Jose Cordero, Fernando Diosa, Maria Saida Bermudez, Leonel Gomez, Michael A. Rodriguez, Sr., Anthony Lanziero, and Israel Arce.**

**Crim. No. B 84–61 (WWE).**

United States District Court, D. Connecticut.

June 20, 1985.

---

Holly Fitzsimmons, Linda K. Lager, James T. Cowdery, Bridgeport, Conn., for the Government.

Hugh F. Keefe, New Haven, Conn., J. Daniel Sagarin, Milford, Conn., Charles Hanken, Bridgeport, Conn., Morris I. Olmer, William Dow, III, New Haven, Conn., Frank Antollino, East Haven, Conn., Richard Reeve, Richard N. Palmer, Hartford, Conn., Ira Grudberg, Jonathan Einhorn, New Haven, Conn., for defendants.

## RULING ON MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE EVIDENCE

EGINTON, District Judge.

Defendants William Donlan, Anthony Vessichio, Michael A. Rodriguez, Sr., Mike Rodriguez, Jr., and Fernando Diosa are charged with conspiracy to possess cocaine with the intent to distribute. These defendants move to suppress the contents of all intercepted wire and oral communications or evidence derived from such communications. The defendants contend that (1) the Government violated 18 U.S.C. 2518(1)(c) by failing to explore traditional investigative procedures and by misleading the court as to the success of such procedures, and (2) the Government violated the sealing and delivery provisions of 18 U.S.C. 2518(8)(a).

The court conducted evidentiary hearings on January 16 and 31, 1985, at which Drug Enforcement Administration ("DEA") special agent Barry P. Abbott was the only government witness to testify. The transcript of his two days of testimony will be referred to as Transcripts I and II ("Tr. I" and "Tr. II").

In addition, the defendants presented Attorney Richard Fuchs to testify in support of their first claim, concerning the validity of the wiretap affidavit. The transcript of his testimony, taken on February 15, 1985, will be referred to as Transcript III ("Tr. III").

For the reasons. set forth below, the court finds that the government has violated the sealing provisions of 18 U.S.C. 2518(8)(a). Accordingly, the motion to suppress is GRANTED.

## FINDINGS OF FACT CONCERNING THE GOVERNMENT INVESTIGATION

The moving defendants seek to suppress the electronic recordings gathered from a wiretap on the telephone of convicted co-conspirator Betty Guevara. The first issues underlying the suppression motion are (1) whether the government conducted an adequate investigation before installing the wiretap, and (2) whether the government falsely represented the need for the wiretap.

In order to discuss the purpose of the wiretap, the court will review the investigative procedures that the government pursued before it sought the wiretap. These procedures are discussed in the affidavit and testimony of Agent Abbott.

### Purpose of the Wiretap

The wiretap order was issued upon an application submitted by the United States Attorney and an affidavit of DEA special agent Barry P. Abbott, both dated August 6, 1984. Government Exhibits ("Gov. Exs.") 1B, 1C.

Abbott's affidavit ("Aff.") states that he and other federal and state law officers had conducted a three year investigation of a southern Connecticut cocaine distribution network, involving Columbian traffickers. Abbott had identified the supplier of the network as a woman called Anna Rosario, also known as Anna Alverez, a cousin of Guevara who lived in Queens, New York. Tr. II 166. Although Guevara was the immediate target of the wiretap, its ultimate purpose was to gather evidence against Rosario. Tr. I 101, 104, 127; Tr. II 24–26, 81, 182.

### Tips and Telephone Toll Analyses

Prior to the wiretap application, The DEA had been involved in investigations of a group of 10 suspected drug traffickers, 8

of whom were convicted. Telephone toll analyses conducted on the phones of these suspects and Rosario, as well as tips given by reliable informants, supplied Agent Abbott with information against Rosario.

### Testimonial Evidence

This initial information against Rosario did not include testimonial evidence of any violations of federal narcotics laws. Abbott's affidavit stated that none of the 10 "network" defendants agreed to provide information which could be used to prosecute the traffickers' source, Anna Rosario. Abbott's confidential sources were unable to reveal the scope of the complete trafficking operation.

Abbott's testimony at the suppression hearing differed slightly from this summation. Abbott testified that one defendant, Garcia, would have provided direct testimonial evidence against Rosario, but the information would not have been current. Garcia had been incarcerated since his arrest in 1981. Abbott's wiretap application was filed in August 1984. A similar situation existed with a second defendant, incarcerated since 1983. Tr. II 188–89.

### Likelihood of Defendant Cooperation

Abbott's affidavit concluded that no lawful inducement, such as immunity from prosecution, or the witness protection program, could persuade uncooperative witnesses to testify against Rosario. This conclusion was based on Abbott's experience that "Columbian cocaine traffickers have no regard for human life and engage in retaliatory murders of the family members of persons they suspect are providing information [to] law enforcement authorities...." Aff. pars. 50, 51.

Abbott's conclusion was corroborated by information regarding Rosario. In 1982, Rosario entered a private residence during the course of Drug Task Force search. Through a pat-down, the agents discovered that Rosario was carrying a .25 calibre pistol with silencer in her purse. See Tr. II 167.

In addition, potential witnesses expressed fear of retaliation from Rosario's associates. Tr. II 22, 197–98. Abbott testified that one man connected with the Rosario network had been murdered. Tr. II 169.

Abbott also testified that cooperation probably could not have been induced through the threat of a contempt citation against any defendant who was already incarcerated. Tr. II 166. Nor would immunity have prompted cooperation, given the personal risk that cooperation posed. Tr. II 24. The court finds that Agent Abbott's conclusions concerning the unlikelihood of defendant cooperation were valid.

### Pen Register and Toll Information

A pen register was installed on Betty Guevara's phone on May 7, 1984, and continued until July 3. Analysis of the register printouts disclosed numerous calls to numbers attributed to known and suspected cocaine traffickers, including 10 calls to a business owned by Rosario. Abbott's affidavit stated that analysis of telephone toll records and the data from Guevara's pen register had not "achieved the goal of the investigation"—evidence to support an indictment against Rosario. See Tr. II 181. The pen register did not identify the individuals making the calls, nor could it disclose the content of the conversations.

### Undercover Purchases

After the pen register was installed on Guevara's line, Abbott arranged, through an informant, to purchase one ounce of cocaine from her. On May 14, Guevara told the informant that she, Guevara, would be going to New York, presumably to obtain the drugs from her supplier. Detective Robert O'Sullivan of the New York Police Department observed Guevara's car near the business of Rosario that same day. Later that evening, Guevara told the informant that she had obtained the cocaine. Guevara sold the ounce of cocaine to Abbott, working undercover, on May 15. She told Abbott that her supplier was "family" in New York. Tr. II 72–75.

The price of the one ounce purchase was $1,800. Guevara informed Abbott that she could supply kilograms for $45,000. Tr. I 123–24. After the wiretap began, Abbott purchased a half kilo from Guevara, at a cost of $25,000. Abbott testified that Guevara told him that it would be "no problem" to supply him with a kilo or more. However, Abbott never questioned whether he might purchase 10 or 15 kilos, so that Guevara might refer him directly to her source. Tr. II 34–38.

This omission was tactically necessary. Other defendants within Rosario's network had supplied undercover agents with multi kilos of cocaine, yet none had ever referred the agents directly to Rosario. Abbott testified that had he bought a half to one kilo once or twice a month for a long period of time, only then would he be able to ask for 10 or 20 kilos without raising Guevara's suspicions. Yet with the limited monetary resources of the DEA, Abbott was unable to make such frequent purchases. Tr. II 170–72.

*Surveillance*

May 15 was the only day, before the wiretap began, on which Abbott knew that Guevara was going to New York for a drug pick-up. It was therefore the only day before the wiretap that surveillance on Guevara was conducted in New York. Surveillance in Connecticut was made on Guevara at those times when she met with Abbott. Tr. II 26–29, 72–75.

Once the wiretap began, Abbott had advance notice of Guevara's trips to New York. Nevertheless, he decided against conducting surveillance in New York. A physical surveillance would have required that the agents sit in their car outside a particular location for an extended period. Tr. II 27. As all the cars to which Abbott had access bore Connecticut license plates, it would have been difficult to conduct surveillance without arousing suspicion. In addition, Abbott's team members, all non-Hispanics, would not have blended into the neighborhoods of Rosario's businesses. Tr. II 185–86.

Rosario was regularly surveilled, however, by the New York authorities. Tr. II 30. Abbott was not told that any useful information was gained through surveillance on Rosario. Presumably, no pertinent evidence was gained. Tr. II 205. Abbott's affidavit stated that surveillance of the defendants in the present case was generally difficult because the suspects were "extremely cautious and alert for law enforcement activity."

Both Rosario and Guevara had cars and telephones registered under false names. Tr. II 175–79. Several times, while under surveillance, Guevara drove in an erratic manner at high speeds, as is to shake off her observers. Informants told Abbott that defendant William Donlan was "always looking for police surveillance." Defendant Anthony Vessichio was aware of police surveillance, and had foreknowledge of an impending search warrant. Vessichio was able to destroy evidence before the police arrived. Tr. I 123–25, 172–73.

Significantly, Abbott noted that even a highly successful surveillance would not provide evidence sufficient to support prosecution. Surveillance may have confirmed meetings between suspected conspirators, but could not reveal the content of their discussions.

*Absence of Searches*

Abbott testified that his team decided against obtaining a warrant to stop and search Guevara when she returned from New York on May 14. Abbott explained that frequently a dealer will tell an undercover agent that she will obtain drugs on a certain date, yet will be unable to do so. The agent had no direct knowledge that Guevara possessed drugs when she left Rosario's business. He believed that he lacked probable cause to support a warrant. If Abbott were to have stopped and searched Guevara without finding drugs, the investigation would have been compromised. Instead, he chose to allow Guevara to continue her criminal activity, a common practice in investigations of this nature. Tr. II 182–84.

Nor did Abbott attempt to obtain a search and seizure warrant for Rosario's business. Abbott's affidavit states that there was no probable cause to believe that large quantities of cocaine were stored at any identified location. Accordingly, a search warrant issued prior to electronic surveillance "would not provide sufficient evidence to determine the full scope" of the conspiracy. *See* Tr. II 75–77.

The lack of probable cause also prevented the agents from obtaining a warrant when Guevara returned from subsequent trips to New York. Abbott testified that probable cause would have required evidence of Guevara leaving Rosario's business holding a package. Such evidence did not exist. Tr. II 184–85.

### Absence of Wiretap on Rosario

Abbott's first choice for a wiretap would have been Rosario's phone, rather than Guevara's, but he lacked the necessary jurisdiction. He repeatedly requested that the New York authorities install a tap on Rosario, but was told that New York lacked the resources. Nor could a joint New York/Connecticut operation be arranged. Tr. II 32–34, 141–43, 201–02.

### Other Investigative Techniques

Other investigative techniques attempted by the government included a failed effort to engage defendant William Donlan in an undercover narcotics transaction, and a futile search of defendant Anthony Vessichio's home. Tr. I 99, 103.

## CONCLUSIONS OF LAW CONCERNING GOVERNMENT'S INVESTIGATION

### Defendants' Motion to Suppress

■ The federal wiretap statute requires that an application for electronic surveillance include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous...." 18 U.S.C. 2518(1)(c). The requirement is "simply designed" to assure that the government does not resort to wiretaps when less intrusive investigative techniques would suffice. *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). Wiretaps are not to be "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974).

The defendants here contend that the government, through its application and affidavit, misstated both the success of prior investigative techniques and the futility of further traditional investigation, and overstated the size of the alleged conspiracy. Relying on *United States v. Lilla*, 699 F.2d 99 (2d Cir.1983), the defendants move that the fruits of the wiretap be suppressed. *See also* 18 U.S.C. 2518(10) (evidence derived from unlawful interceptions, or from interceptions made without conformity to the order of authorization, may be suppressed).

### Success of Traditional Investigative Techniques

■ The defendants argue that the traditional investigative techniques used prior to the wiretap application, including telephone toll analyses of previously arrested defendants, installation of a pen register on Guevara's phone, a one ounce cocaine purchase from Guevara, and surveillance of Guevara near Rosario's business, brought the government extremely close to "getting to" Anna Rosario. Defendants' memorandum at 23. *See generally Lilla*, 699 F.2d at 103 n. 5 (defining traditional investigative techniques).

The court disagrees. The stated goal of the wiretap was to gather evidence against Rosario, not Guevara. Although investigations prior to the wiretap had developed evidence sufficient to convict Guevara, Tr. II 25, 136–40, this evidence was not sufficient to support an indictment against Rosario. Nor can the court refute Abbott's conclusion that the evidence did not establish probable cause for a search warrant on Rosario's business. The government did

not misstate either the extent or the success of its traditional investigation.

### Investigation Prior to Wiretap

The defendants argue that the government did not adequately investigate Rosario and her network before seeking the wiretap. In addressing these claims, the court notes that the Second Circuit does not require that traditional surveillance techniques be exhausted before a wiretap is used, if the traditional procedures would be impractical, costly, and inconvenient. *United States v. Lilla,* 699 F.2d 99, 102 (2d Cir.1983).

■ The Circuit has found that surveillance is impractical if the subjects are "difficult to tail" because of their cautiousness. A wiretap may also be justified if evidence indicates an expansive narcotics operation, if the defendants' location makes surveillance difficult, if they have refused to identify their source, or if the nature of the offense is such that only electronic surveillance can produce the evidence necessary for conviction. *Id.* at 103–04 (citations omitted). The court finds that all these considerations come into play with the present case.

■ The federal wiretap statute does not require that any particular investigative steps precede a wiretap application. *Id.* at 104. It is a question of common sense. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 101, *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2190.

■ Defendants base their claim of inadequate investigation on three omissions. *First,* there was no follow-up purchase of cocaine from Guevara. The court finds that Abbott's affidavit and testimony establish that larger purchases were unlikely to secure the necessary evidence against Rosario. The low chance of success prohibited the high cost of continued purchases.

■ *Second,* there was no surveillance of Guevara prior to the electronic surveillance, except for those times when she met with Agent Abbott. Abbott could have not

advance notice of when Guevara might connect with her source in New York. Moreover, surveillance in New York might compromise the investigation, as all surveillance vehicles bore Connecticut license plates. Surveillance of Guevara was so inconvenient that the court finds that it need not have been comprehensively undertaken prior to the wiretap.

■ *Third,* there was no surveillance or attempted purchases from any of the allegedly "known and suspected cocaine traffickers in the New Haven area" prior to the wiretap (quoting Aff. par. 44). Such techniques were used during the prior, independent investigation of 10 defendants, most of whom are unnamed in the current indictment, who allegedly belonged to Rosario's network. However, these techniques were not used in the investigation of the present case. The procedures were not practical means of obtaining the necessary evidence against Rosario. Surveillance and purchases would have been as unfeasible against the defendants named in the present action as they were against Guevara.

Finally, the court finds that Abbott's affidavit provides a substantial factual basis to support his conclusion that traditional investigative techniques would be unavailing. *See Lilla,* 699 F.2d at 104 (conclusory statements that other procedures would be unsuccessful do not satisfy the wiretap statute).

### Alleged Misstatements in Affidavit

Defendants contend that the affidavit submitted in support of the wiretap application contains numerous factual misstatements, which warrant suppression of the wiretap tapes. The court held full evidentiary hearings on these claims, and now dismisses them.

■ The fourth amendment requires that a warrant affidavit make a truthful showing. The Supreme Court has explained this requirement, stating, "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit

is necessarily correct ... [but] that the information put forth is believed or appropriately accepted by the affiant as true." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978).

*Franks* held that before a hearing may be held concerning factual misstatements in a warrant affidavit, the challenger must first make a sufficient showing that the misstatements were deliberate, or that they were made with reckless disregard for the truth. *Id.* at 171, 98 S.Ct. at 2684.

■ The court finds, after two days of testimony, that the defendants cannot show that the challenged statements were deliberately false, or that they were made with reckless disregard for the truth. Accordingly, under *Franks*, the warrant must stand.

The court will address only those challenged statements which were material to the existence of probable cause. *See United States v. Marin-Buitrago*, 734 F.2d 889, 895 (2d Cir.1984).

### Likelihood of Defendant Cooperation

■ Agent Abbott's affidavit describes investigations, independent from the present case, which resulted in arrests of 10 Columbian cocaine dealers, whose suspected source was Rosario. The affidavit states, "None of these defendants has agreed to cooperate in the investigation...." Aff. par. 6. *See also* par. 50.

Defendants contend that this statement implies that each defendant was specifically questioned as to his willingness to supply information to the government. Abbott testified that it is standard DEA procedure to ask for defendant cooperation. Tr. II 47. In the present case, however, the specific question may sometimes have been addressed to the defendant's attorney. Tr. II 43–45, 48; Tr. III 10–15. It would be repeated each time Abbott or another DEA agent met with defense counsel, totalling about two or three times for each defendant. Tr. II 51.

The request for cooperation was not usually repeated after conviction or guilty plea. Abbott testified that "the offer stood," and that each defendant "hopefully" knew this fact through his attorney. Tr. II 49.

At least four defendants were personally questioned about cooperation, prior to the wiretap. These four defendants answered that they had no knowledge as to their supplier. Tr. I 113–14; Tr. II 50, 55, 196; Tr. III 11. *But see* Tr. II 188–89 (Abbott received information that one of the four defendants, Ricardo Garcia, would have testified against Rosario, but could not provide current evidence). One of these defendants, Saida Bermudez, upon rearrest by another agency, was not requestioned by Abbott. Tr. I 128–30.

One of the ten defendants, Fernando Diosa, was questioned by agents from Statewide Narcotics. Abbott was told by these agents that the defendant would not cooperate. Abbott did not know whether these agents had directly questioned the defendant about cooperation. Tr. II 53–54.

In one instance, Abbott concluded that a defendant would not cooperate because she refused to speak after having been advised of her *Miranda* rights. But even here, repeated requests for cooperation were made to defense counsel. Tr. II 41–45. In another instance, Abbott concluded that a defendant would not cooperate after he had pled not guilty. Abbott added that once the defendant was placed under indictment, the agent could not speak to him about his case. Tr. I 108, 110.

The court finds that Abbott's testimony corroborates his affidavit statements concerning cooperation among the 10 defendants. The statements are neither deliberate falsehoods, nor were they made with reckless disregard for the truth.

### Size of the Conspiracy

■ Defendants claim that Agent Abbott's affidavit overstated the size of the conspiracy. The court disagrees, and finds that the affidavit accurately describes the targeted drug network. *Compare* Gov.Ex. 3 *with* Aff. pars. 14–43 (daily reports de-

scribing intercepted calls of Guevara wiretap indicate a network as large as that described in affidavit). *See also United States v. Lilla*, 699 F.2d 99, 105 n. 6 (2d Cir.1983) (wiretapping is valid investigative option if the suspected conspiracy involves a relatively large number of people who plan their drug deals by telephone).

### Occurrence of Calls

■ Before applying for a wiretap, the government installed a pen register on Guevara's phone, from May 7 until July 3, 1984. The defendants argue that the affidavit mischaracterized the pen register printouts, and that suppression of the wiretap evidence is therefore warranted.

The court agrees that one portion of the description is misleading. The affidavit states, "Analysis of the pen register information showed the following numbers called more than once a day:

| | | |
|---|---|---|
| [number omitted] | ONE STOP CLEANERS | (32 times) |
| [number omitted] | MIKE A. RODRIGUEZ | (78 times) |
| [number omitted] | ISRAEL ARCE | (112 times)" |

The immediate understanding imparted by this passage is that these telephone numbers were called 32, 78, and 112 times in a single day. However the chart represents the total number of calls during the three month period from May to July.

The remainder of the affidavit's paragraph chart corrects the initial confusion, reading, "In general, the pen register shows that the number of calls varies daily depending on whether BETTY Guevara is home. The average is *10 to 15 calls per day*, usually clustered [in the morning and evening]. *On its busiest day*, June 29, 1984, the *register recorded 105 calls*, 30 answered incoming and 75 outgoing. The latter figure includes repeat dialings. [Emphasis added.]" Aff. par. 42.

The affidavit clearly states that the average number of calls made from Guevara's telephone was 10 to 15 calls per day. Given this clarification, which appears on the same page as the challenged passage, the court cannot find that the misleading passage was made either deliberately or with reckless disregard for the truth.

Moreover, were the challenged portion to be struck, the affidavit would still establish probable cause for ordering the wiretap. Accordingly, the court upholds the validity of the wiretap order. *United States v. Marin-Buitrago*, 734 F.2d 889, 895 (2d Cir. 1984).

### FINDINGS OF FACT CONCERNING JUDICIAL SEALING OF THE TAPES

The second claim of the defendants' suppression motion is that the government violated the sealing requirement of 18 U.S.C. 2518(8)(a). The issues presented to the court are (1) whether the wiretap tapes were immediately sealed by the court, and (2) whether the government has justified any lack of an immediate judicial sealing.

In addressing the defendants' claim, the court will first examine the security precautions taken during the wiretap, and the circumstances surrounding the delay in sealing the tapes.

The wiretap on the telephone of convicted coconspirator Betty Guevara, pursuant to judicial order, began on August 6, 1984 and ended on September 5, 1984. Gov.Ex. 3; Tr. I 142, 145. The machine which intercepted the phone calls was hooked up to two reel-to-reel recorders and one cassette player, all of which recorded simultaneously. Tr. I 34, 138, 155. The cassette tape was the government's work copy, used whenever the agents wished to replay a conversation. Tr. I 138–40. The second reel-to-reel was a back-up tape to be used in case of mechanical difficulty with the first reel-to-reel. This back-up was also used to make the government's transcriptions of intercepted conversations. Tr. II 187. Neither the cassette tape nor the back-up reel-to-reel were sealed by the government or the court. Tr. I 139, 143, II 135–36.

The United States Attorney's initial instructions to the agents on the wiretap made no mention of sealing the tapes. Tr. I 30–32, 141–42, Gov.Ex. 2. During the course of the wiretap, the DEA agent in charge, Barry P. Abbott, spoke each day

with the Assistant United States Attorney ("AUSA") supervising the case. Tr. I 30. Abbott was given no instructions on sealing the tapes during this time. Tr. I 73, 83. Nor had Abbott read, or been informed of, the sealing provisions of the wiretap statute, 18 U.S.C. 2518(8)(a).

Nevertheless, Abbott instituted a procedure to seal the tapes at the listening post. Each reel-to-reel tape would record for a 24 hour period. At the end of this period, at about midnight each night, the "original" reel-to-reel tape would be rewound, taken off the machine, and placed in a box. The box would be marked with the number of the tape. An evidence seal would be placed on the box. The box would be placed in an envelope, and the envelope would be marked and then heat sealed. Tr. I 41. These envelopes were ultimately submitted for judicial sealing. Tr. I 81.

Because this procedure was followed just after midnight, the heat-sealed tapes could not immediately be brought to the DEA evidence vault in Hartford, which was closed at that hour. Tr. II 153–54. Abbott testified that for all but four or five days of the one month wiretap, Tr. I 77, an agent named Giandana had the shift that ended at midnight. It was therefore Agent Giandana who took custody of most of the tapes before handing them over to the DEA evidence custodian.

Abbott, the government's sole witness at the suppression hearing, testified that he had no information concerning Giandana's custody of the tapes. Tr. I 89–90; *see also* Tr. I 77. Abbott also testified that he did not know if any particular custody procedure was customary to the DEA. Tr. I 78. Nor did Abbott state that he had given Giandana specific instructions as to custody of the tapes. Finally, he testified that he did not believe that the U.S. Attorney's office was aware of his own custodial practice. Tr. I 78. The court assumes that the U.S. Attorney's office was equally unfamiliar with Giandana's practice.

Abbott manned the closing shift, in the absence of Giandana, on four or five occasions. (Only 26 tapes were produced by

the wiretap. Gov.Ex. 3. The court will thus assume that Giandana had temporary custody over 21 tapes, and that Abbott had custody over 5). Abbott's practice was to bring the heat-sealed tape home with him at night, and deposit it at the DEA evidence vault at his earliest opportunity. Tr. I 74. This resulted at times in a delay as long as 32 hours before the tapes were placed within a locked vault. Tr. I 80.

Abbott testified that he would place the tapes within an armoire in his bedroom, where he also kept his gun. He said that no one, including his wife, had access to this armoire. Tr. I 80. The bedroom door was locked while the tapes were within the room. Tr. I 76. Whenever Abbott left this room, he would carry the tape with him. Tr. I 80. Never did he unseal any of the heat sealed envelopes over which he had custody. Tr. II 153.

The wiretap ended at 12:05 A.M. on September 5, 1984. Tr. I 145. At some unspecified time after September 5, Abbott was told by Holly Fitzsimmons, the supervising AUSA, that the tapes had to be delivered to the judge who had authorized the interception, so that the tapes might be sealed. Abbott was not told by Holly Fitzsimmons, the supervising AUSA, that the tapes had to be delivered to the judge who had authorized the interception, so that the tapes might be sealed. Abbott was not told when this judicial sealing would take place. Tr. I 71, 83–84. The court infers from Abbott's testimony that he understood, correctly, that he was not to make the appointment with the judge, but that it would be made by the AUSAs on the case.

The only other information that the U.S. Attorney's office gave Abbott was to tell him when a sealing appointment with the judge who had authorized the wiretap (the "issuing judge") had been set. Abbott was told of this appointment shortly before it took place, on September 19, 1984. Tr. I 83–84.

The tapes went without judicial sealing from September 5 until September 19. This delay is the basis of the defendants' second suppression claim. During this pe-

riod of delay, Abbott devoted essentially all of his time to the investigation of the present case. Tr. I 98–99. He communicated several times with the AUSAs. Tr. I 98. He appeared before the Grand Jury on this matter on September 6. Tr. I 85.

(In later testimony, Abbott spoke of the Grand Jury proceedings taking place over several days. Tr. II 154–55. Nevertheless, in light of Abbott's testimony, the court finds that he made only a single appearance before the Grand Jury, on September 6. The relevant testimony is: "I believe on the 6th I had Grand Jury, but apart from the Grand Jury appearance, if I had been instructed to appear in front of Judge Burns [the judge who sealed the tapes], I would have." Tr. I 85. This finding of a single Grand Jury appearance is in accord with the government's recounting of the events. Government memorandum at 33.)

Abbott testified that two arrests in the case were made after the Grand Jury indictment. He testified that he was not the arresting agent in these arrests. He also stated that although he believed that he was involved in those arrests, he could not actually remember whether he was involved. Tr. II 154–56.

In testimony pertaining to a separate suppression motion brought by another defendant in this action, Abbott testified that he was the arresting officer in an arrest and a criminal presentment in New Haven on September 17. Both the government and the defense concur on this point. Transcript of 12/10/84 hearing at 120–21, government memorandum at 33, defendants' reply memorandum at 2.

At the hearings on the present motions, Abbott testified that aside from the one Grand Jury appearance previously mentioned, he was available to appear for judicial sealing of the tapes at all times from September 5 to 14. Tr. I 84–85. This statement appears to differ from later testimony, in which Abbott said that he was personally required to attend several post-arrest hearings on the present case in New Haven during early September. Tr. II 157. The court notes that the issuing judge, who eventually sealed the tapes, sits in New Haven. The court finds that arrangements for the judicial sealing could have been made for any day on which Abbott appeared in New Haven for post-arrest hearings, barring only those days when the issuing judge was not in chambers.

The "original" tapes that were judicially sealed had never been listened to or duplicated by either the case agents or the AUSAs. Abbott testified that these tapes were never intended to be so used, Tr. II 191, but were always meant to be immediately heat sealed and ultimately judicially sealed.

Most importantly, Abbott testified that the only reason he knew of for the sealing delay was that the AUSAs had not made the necessary appointment with the issuing judge. Tr. I 85.

Abbott also testified as to the availability of the supervising AUSA, Holly Fitzsimmons. He testified that she was, during the period of delay, preparing for another trial that commenced on September 17. Tr. II 156–57. Abbott gave no further description of Fitzsimmons' work. He did say that Fitzsimmons was present in her Bridgeport office during the entire period of delay, and that she could, during that time, always be reached by telephone. Tr. II 191–92.

In addition, the court finds that other AUSAs on the case appeared for grand jury indictments and criminal presentments during the period of delay. Defendants reply memorandum at 5.

The appointment for the judicial sealing was not made by Fitzsimmons, but was set up by another AUSA on the case, Linda Lager. Tr. I 98. It was Lager who accompanied Agent Abbott at the sealing; Fitzsimmons did not attend. Tr. II 193–94.

Abbott testified that it is acceptable practice for a DEA agent to turn to any AUSA if the supervising AUSA on a matter, such as Fitzsimmons, is not available. Tr. II 193–94.

Although there was no evidence presented as to the issuing judge's availability, the

government stated in its supporting memorandum, and the court finds, that the judge was absent from her chambers on September 13 and 14. Government memorandum at 13.

At the judicial sealing, the issuing judge inspected the heat seals that the wiretap agents had already placed. The heat sealed envelopes were then all placed in a box which was taped shut. Tr. I 81.

## CONCLUSIONS OF LAW CONCERNING JUDICIAL SEALING OF THE TAPES

### The Federal Wiretap Statute

█ Intercepting wire communications, bugging a telephone, is a serious intrusion into protected rights of privacy. The federal wiretap statute thus restricts the availability of phone taps, and governs their implementation. *United States v. Vazquez*, 605 F.2d 1269, 1272 (2d Cir.1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). To "ensure careful judicial scrutiny" in the gathering and use of wiretap evidence, the statute requires that all tapes of intercepted conversations be sealed "immediately" at the wiretap's end. *United States v. Gigante*, 538 F.2d 502, 505 (2d Cir.1976).

The pertinent portion of the statute reads as follows:

Immediately upon the expiration of the period of the [wiretap] order, or extensions thereof, such recordings [authorized by the statute] shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders.... The presence of the seal provided by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communications or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C. 2518(8)(a).

Defendants claim that the government failed to immediately seal the tapes of conversations on Betty Guevara's phone, and that the government has not offered a satisfactory explanation for this failure. Defendants contend that government has not met the statutory "prerequisite" for the use of the tapes at trial, and that the tapes must therefore be suppressed.

█ The Guevara tapes, judicially sealed 14 days after the expiration of their authorizing order, were not sealed "immediately" after the wiretap's termination. *United States v. Vazquez*, 605 F.2d 1269, 1278 (2d Cir.1979) (a sealing achieved one or two weeks after expiration of a wiretap cannot be considered "immediate."). Under the wiretap statute, then, the tapes must be suppressed unless the government can adequately justify its delay.

### Split Between the Circuit Courts

The circuit courts are split on this question of justification, the Second and D.C. Circuits differing sharply from the Third, Fourth, Fifth, and Seventh. *United States v. Diana*, 605 F.2d 1307, 1314–15 (4th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980) (39 day delay satisfactorily explained by government's need to keep original tapes on hand in case duplicate tapes proved faulty, despite fact that government might have obtained court order to unseal specific tapes, if necessary).

The Third Circuit has held that an unspecified "administrative delay" may be a satisfactory explanation for the delayed sealing of tapes. *United States v. Falcone*, 505 F.2d 478, 484 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).

The Fifth Circuit has ruled against suppression without even examining the reasons for the government's delay. In its most recent ruling on the issue, the Fifth Circuit held that the sealing provisions of the statute are not violated so long as (1) there has been no tampering with the tapes, and (2) the defendants are not prejudiced by the delay. Satisfied on these points, the court did not address the government's explanation. *United States v. Diadone*, 558 F.2d 775, 780 (5th Cir.

1977); *but see United States v. Sklaroff,* 506 F.2d 837, 840 (5th Cir.1975) *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975) (14 day delay satisfactorily explained in that for 7 days tapes were used to prepare search warrants, and for 7 days tapes were kept securely in FBI evidence room).

The Seventh Circuit has similarly obviated the requirement of a satisfactory explanation. If the sealing is not immediate, and no sound justification is offered, the court will not automatically suppress the tapes. Instead, it will examine whether the tapes have been altered, and if any tactical advantage was sought by the delay. If these have not occurred, then the court deems that the "purpose" of the wiretap statute has been accomplished, "in spite of error." In such circumstances, the Seventh Circuit will not suppress. *United States v. Angelini,* 565 F.2d 469, 471 (7th Cir.1977), *cert. denied* 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978); *United States v. Lawson,* 545 F.2d 557, 564 (7th Cir.1975) *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976) (tapes not suppressed despite government's inadequate explanation of 57 day delay, because integrity of tapes was not challenged).

In contrast, The Second and D.C. Circuits hold that the delayed sealing of tapes, by itself, can be the ground for suppression. The two courts have refused to condition suppression on a claim of tampering. *United States v. Johnson,* 696 F.2d 115, 124 (D.C.Cir.1982) (rejecting suggestion that suppression motion made under sealing provision of wiretap statute must include colorable challenge to the integrity of the tapes).

### Second Circuit Case Law on Sealing Delays

*United States v. Gigante,* 538 F.2d 502 (2d Cir.1976), involved sealing delays from 8 to 12 months, delays which the government conceded that it could not explain. The defendants did not claim that they were prejudiced by the delay, nor did they present evidence of tampering. The government argued that since there was no proof of actual alteration, the tapes should be admitted into evidence. The court dismissed this argument, and suppressed the tapes. *Id.* at 504, & n. 4, 505–507.

As with the situation here, the government in *Gigante* had established its own sealing procedure, calling for the original reel to be placed in a box and sealed with evidence tape as soon as it was removed from the recorder. *Id.* at 503. The *Gigante* court described the sealing procedure as "haphazard," *id.* at 505, referring back to an explanatory footnote in which the court had noted "numerous irregularities" in its execution. *Id.* at 503 n. 1.

Flawed or not, the government's independent sealing seemed to carry little weight in the court's determination. The court held that the tapes were not "immediately" sealed. *Id.* at 507. Lacking a seal *"provided for by this subsection,"* as 18 U.S.C. 2518(8)(a) requires, the tapes could not be used as evidence because there was no satisfactory explanation for the delay in sealing. *Id.* at 506 [emphasis in original].

After *Gigante,* the criteria for a "satisfactory explanation" became the focus of the Second Circuit sealing decisions. Yet a precise definition of the term remained elusive. Unsuccessful attempts to contact the issuing judge proved an adequate reason for 13 and 6 day delays in two decisions which closely followed *Gigante: United States v. Poeta,* 455 F.2d 117, 122 (2d Cir. 1972), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) (13 day delay) and *United States v. Fury,* 554 F.2d 522, 533–34 (2d Cir.1977), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) (6 day delay). Both opinions note that the government was mistaken in its belief that only the issuing judge could seal the tapes.

The *Poeta* court, after finding the government's excuse reasonable, added that defendants had not claimed that the tapes were altered, nor claimed that they were prejudiced by the delay. The court in *Fury,* analyzing a 6 day delay, did not address the tapes' security, but based its

decision only on the reasonable basis for the delay.

Security reemerged as an important consideration in *United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir.1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 400 (1978). The case concerned a delay of 7 days. Here, testimony "that the delay was not the result of any intent to evade statutory sealing requirements or to gain any tactical advantage," figured largely in the court's decision that the "short delay" was justified. The basis of the government's excuse, however, was its prosecutor's preoccupation" with preparations for another trial.

A similar reason was found to justify a 42 day delay in a trial court decision which followed *Gigante*, *United States v. Caruso*, 415 F.Supp. 847, 850–51 (S.D.N.Y.1976), *aff'd mem.*, 553 F.2d 94 (2d Cir.1977). The court found that the delay had been due to the "flurry of excitement and confusion" caused by the sudden need to terminate the wiretap, followed by the hospitalization of the prosecutor in charge, and the case's consequent reassignment. *Id.* at 850.

In judging whether these reasons of "preoccupation" would satisfy the statute, the court considered that the delay yielded no tactical advantage to the government, and that "no tampering was either suspected or hinted." *Id.* at 851. The court relied on these same security factors in holding that other tapes, delayed 24 days before sealing, were also admissible. *Id.* at 850.

A much shorter delay was held to be inexcusable in a Southern District decision, *United States v. Ricco*, 421 F.Supp. 401 (S.D.N.Y.1976), *aff'd other grounds*, 566 F.2d 433 (2d Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978). The court construed New York law, which might, it found, be more stringent than the federal statute. *Id.* at 407. However, the wording of both statutes is virtually identical, each demanding immediate judicial sealing, to be excused only by a "satisfactory explanation." N.Y.Crim. Proc.Law 700.50(2).

A 12 day delay was at issue in *Ricco*. The government stated that two days' delay was caused by the chief police officer's arrest of a coconspirator, a third day's delay was caused by this same officer's day off. *Id.* at 408. All three days were nevertheless deemed part of the period that was not "satisfactorily explained." *Id.* at 411.

Nine days of the delay were occupied by the government's efforts to duplicate the original tapes before sealing. The court found that although a "fast" duplicator was not available to the police in their home borough of the Bronx, it was available to them in Manhattan. In fact, the fast machine was eventually, though belatedly, used in Manhattan. The court found that the government should have used the fast machine in the first instance. Having failed to do so, the government failed to use "reasonable dispatch" to seal the tapes, thereby violating the state wiretap statute. *Id.* at 408–10. The court did not address the issue of tampering. The tapes were suppressed.

The tampering issue was again raised in an Eastern District decision, *United States v. Aloi*, 449 F.Supp. 698, 727 (E.D.N.Y. 1977). The court first determined that the two delays at issue had been satisfactorily explained by the government. The first delay, of 7 days, was due to the issuing judge's unavailability for 5 days, followed by a weekend. The court noted that the state wiretap statute did not require that the issuing judge conduct the sealing. Nonetheless, as in *Poeta* and *Fury*, the excuse passed muster.

The second delay, of 5 days, was caused by "the administrative need to check and inventory the tapes," and by the illness of a member of the prosecution team. The first "administrative" reason seems to be almost identical to the rejected excuse of *Ricco*. The *Ricco* court, however, questioned whether the administrative processing of the tapes was executed with dispatch. The *Aloi* court does not appear to have made that examination.

After discussing the government's delays, the *Aloi* court stated, "In the face of

these reasonable explanations, defendant Hali neither claims nor offers to prove that the tapes were tampered with or otherwise altered. Additionally, he has not shown that he was prejudiced in any way by the delays. Defendant's claim [that the government violated the sealing provision] is, therefore, without merit." *Aloi*, 449 F.Supp. at 727 [citations omitted].

The *Aloi* court, following *Poeta*, *Scafidi*, and *Caruso*, approached the issues of tampering and prejudice as significant, decisive factors in its determination of the government's reasonable excuse.

This same approach was adopted in the Second Circuit's most recent opinion on the issue, *United States v. Vazquez*, 605 F.2d 1269, 1279 (2d Cir.1979). As with *Aloi*, *Vazquez* concerned administrative delays. But unlike *Aloi*, the *Vazquez* court scrupulously queried each detail of the administrative snafus. The court found that the government had planned a wiretap of brief duration, but was unexpectedly required to continue a lengthy tap with very short staff.

The task force attempted to simultaneously record originals and duplicates, but lacked the necessary equipment to always do so. Unlike the *Ricco* surveillance team, the *Vazquez* task force borrowed what equipment they could. Because of staff shortages, much of the duplicating and processing of 200 reels of tape had to be finsihed at the conclusion of the wiretap, before the judicial sealing. This processing caused delays of 7 and 13 days.

The *Vazquez* court found its suppression question "close," *id.* at 1279, noting that within the circuit, delays of comparable length had been deemed both excusable and inexcusable, depending on the circumstances. *Id.* at 1280. The court ruled the delay excusable, adding "where we discern on the government's part no bad faith, no lack of diligence, and no attempt to gain an advantage over the defendants, we believe that the government's lack of foresight regarding the actual scope of the investigation does not justify the exclusion of probative evidence lawfully obtained." *Id.* at

1279. The *Vazquez* court's focus on the government's "diligence" echoed the *Ricco* decision's discussion of "reasonable dispatch."

Yet *Vazquez* added unprecedented cautions to the Second Circuit caselaw on wiretap sealing. This dicta stated:

However, in law as in life, today's satisfactory explanation may very well be tomorrow's lame excuse. As the federal and state case law in this area grows, the failure to foresee and, where possible, prevent sealing delays becomes less justifiable, as law enforcement officials must be expected to learn from their own experiences and those of others. The wiretap statute imposes a duty on the judiciary as well as on the prosecutor.

*Id.* at 1280.

Only two decisions on the sealing issue have been published within the Second Circuit since *Vazquez*. *United States v. McGrath*, 622 F.2d 36, 42–43 (2d Cir.1980), involved delays of up to 8 days. The government's explanation was that it needed to transport tapes from Binghamton to Albany for duplication and processing, and then on to Auburn for sealing. *Id.* at 43. The explanation was thus an administrative delay, similar to that of *Vazquez* and *Aloi*.

The Second Circuit held that the explanation was "reasonably necessary." *Id.* The court first remarked that section 2518 of the wiretap statute "was not intended to bar use of wiretaps only when the defendant can show prejudice or present evidence of tampering or other governmental bad faith." Nevertheless, the court noted that there was "no evidence of prejudice or foul play." Weighing the lack of tampering along with the "relatively short delay," the court found no violation of the wiretap statute.

A trial court decision, *United States v. Lilla*, 534 F.Supp. 1247, 1270–72 (N.D.N.Y. 1982), followed *McGrath*, presenting delays of 3 and 16 days. The court accepted the government's explanations for both delays. The reasons for the 3 day delay included time required to prepare the tapes and

administrative papers, and a "wait" occasioned by the sealing judge's schedule. The court also considered that the tapes were securely stored during the 3 day delay, and that there was no evidence of tampering, governmental bad faith, nor prejudice to the defendants. *Id.* at 1271–72.

The tone of the decision changes when the court turns to the 16 day delay. *Id.* at 1272. Earlier, the court had listed the length of the delay as the first factor to be weighed in determining whether the reason for a delay is "satisfactory." *Id.* at 1271. The 16 day delay was apparently so "troublesome," that the court rejected, without discussion, certain unspecified excuses offered by the government. These excuses presumably could not warrant a delay of over two weeks.

The only explanation that the court entertained was that the delay was caused by the unavailability of the issuing judge. The judge applied New York law to uphold the excuse. Again, the court noted that the tapes were securely stored, that the defendants did not seem to be prejudiced by the delay, and that the government had not acted out of bad faith.

### The Government's Explanation

In the present case, the government describes its 14 day delay in judicially sealing the tapes as "relatively short." Government memorandum at 32. The description is significant, for the length of the delay is crucial to any decision concerning the validity of the government's excuse. *See McGrath*, 622 F.2d at 42. The court rejects the government's description.

The term "relatively short" was used by the *McGrath* court to describe an 8 day delay. Yet the length of a 16 day delay was found to be "troublesome" by the *Lilla* court, 534 F.Supp. at 1272, and delays up to 13 days were sufficient to prompt a scrupulous examination of the government's explanation in *Vazquez*, 605 F.2d at 1279. The delay here requires similar attention.

The court notes that the government has not contended (nor did it offer evidence) that it sought to have the tapes sealed on September 13 or 14, the two days during which the issuing judge was absent from chambers. *See* government memorandum at 33.

Further, the unavailability of an issuing judge does not justify a delay in sealing. *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.1972), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972), *United States v. Fury*, 554 F.2d 522, 533–34 (2d Cir.1977), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). Accordingly, the court concludes that the two day unavailability of the issuing judge does not excuse the government's delay.

In its memorandum, the government lists several reasons for the delay that began on September 5 and ended September 19: (1) Agent Abbott's appearance before the grand jury on September 6, (2) two additional arrests which followed the indictment, (3) Abbott's arrest and presentment of defendant Donlan on September 17, (4) Donlan's indictment on September 19, (5) AUSA Fitzsimmons' extensive trial preparation on another criminal case.

The first reason offered, Abbott's appearance before the grand jury on September 6 is supported by Abbott's testimony. Tr. I 85–86. Reason (1) accounts for a one day delay. The court notes, however, that a police officer's arrest of a conspirator was held not to be a satisfactory explanation of a one day delay in *United States v. Ricco*, 421 F.Supp. 401, 411 (S.D.N.Y.1976), *aff'd other grounds*, 566 F.2d 433 (2d Cir. 1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978).

Yet the whole of Agent Abbott's testimony undercuts the remaining explanations. Abbott appeared to have no real involvement in the two arrests listed as reason (2). Certainly, he could not remember whether he was involved, Tr. II 154–56, nor does the government claim that he was involved. As Abbott was the only DEA agent needed for the judicial sealing, the arrests of rea-

son (2) cannot be considered as an explanation of the delay.

Reasons (3) and (4) concern the arrest, presentment, and indictment of defendant Donlan, all of which occurred in New Haven. The court has already found that arrangements for the judicial sealing could have been made for any day on which Abbott appeared in New Haven for post-arrest hearings, as the issuing judge was in chambers on both dates. The government has not claimed that it attempted to arrange a judicial sealing on these days. The court is not satisfied by reasons (3) and (4).

Reason (5), AUSA Fitzsimmon's preparation for another trial, resembles the satisfactory explanations of *Scafidi* and *Caruso*. However, the government has presented no evidence to support the validity of this explanation. Agent Abbott testified that Fitzsimmons was preparing for another trial during the period of delay. But he gave no description of her involvement with this other trial, or the extent of her preparations. There is no evidence that Fitzsimmons was "preoccupied," as was the attorney in *Scafidi*, or that she was caught in a "flurry of confusion," as was the attorney in *Caruso*.

Agent Abbott did not even suggest that Fitzsimmons' schedule rendered her unable to oversee the judicial sealing. However, the government suggests that Fitzsimmons' unavailability may be assumed from the fact that another AUSA, Linda Lager, arranged for and accompanied Abbott at the sealing.

But Lager's substitution points out that there was never a cause for delay. Agent Abbott testified that it is acceptable practice for a DEA agent to turn to any AUSA for assistance when the supervising attorney is not available. Tr. II 193–94. The court has already found that government attorneys other than Fitzsimmons appeared at grand jury proceedings and criminal hearings related to the case during the period of delay.

It is factually established that the practice of this task force was for all the AUSAs to make court appearances when necessary. If Fitzsimmons' schedule made it difficult for her to arrange for the judicial sealing, it was thus standard procedure for another AUSA to assume the responsibility.

The circumstances of this case show that the delay was caused by the government's failure to act with the diligence required by *Vazquez*, 605 F.2d at 1279 and *Ricco*, 421 F.Supp. at 410. Agent Abbott himself testified that aside from his one day appearance before the grand jury, the only reason he knew for the delay was that the government failed to arrange for the sealing. Tr. I 84–85. Fitzsimmons' trial preparation cannot excuse the 14 day delay. *See United States v. Angelini*, 565 F.2d 469, 472 (7th Cir.1977) ("a satisfactory explanation is one in which the Government shows that it acted with dispatch and all reasonable diligence to meet the sealing requirement").

██ The government's explanation is not the only factor to be addressed when considering a claim made under section 2518. Under *United States v. McGrath*, 622 F.2d 36, 42 (2d Cir.1980), the court must also examine the length of the delay, evidence of tampering, the time required to prepare the tapes for sealing, and whether the defendants were prejudiced by the delay.

The troublesome length of the delay at issue has already been discussed, *see supra* at 36–37. *See also Vazquez*, 605 F.2d at 1278 (a sealing after 1 or 2 weeks is not "immediate"). The 2 week delay of this case is not so short that it makes the government's explanation acceptable. Nor is a mitigating factor to be found in the time required to prepare the tapes, for no duplication or processing was required. The original tapes were ready for sealing as they were removed the recorder. There was no administrative need for delay. The government's analogies to *Caruso*, *Vazquez*, and *McGrath* are thus inapposite.

This leaves only the questions of tampering and prejudice to the defendants. Certainly the defendants have made neither

claim. "To demand such an extraordinary showing [of tampering] would vitiate the Congressional purpose in requiring judicial supervision of the sealing process." *Gigante,* 538 F.2d at 505. This purpose, of course, is simply to assure that evidence of intercepted communications is accurate. *Vazquez,* 605 F.2d at 1274.

Alterations in taped evidence are easy to make, and difficult to detect. *Gigante,* 538 F.2d at 505. *Accord United States v. Johnson,* 696 F.2d 115, 124 (D.C.Cir.1982) (decision adopts Second Circuit holding that suppression need not be conditioned on showing of actual tampering, rejecting the conflicting premise of Third, Fifth, and Seventh Circuits, *id.*). Courts should not cast the burden of proving tampering upon "defendants who have no knowledge about the recording and custody of the tapes." Nor should courts be bogged down in a time-consuming, expensive battle on the tampering issue. *United States v. Diana,* 605 F.2d 1307, 1318 (4th Cir.1979) (Hall, J., dissenting). The costs of such battles can best be avoided through strict compliance with the statutory sealing provisions. *Johnson,* 696 F.2d at 124.

Significantly, the Second Circuit appears to have adopted the D.C. Circuit approach of *Johnson* that "evidence from which the court can infer that the tapes were held in [a secure condition] will be an important component of the Government's 'satisfactory explanation.' If the Government cannot present such evidence, its explanation will be highly suspect." *Id.* at 125. *See United States v. McGrath,* 622 F.2d 36, 42–43 (2d Cir.1980).

The tapes at issue were, according to Agent Abbott's procedure, to be heat sealed immediately after being removed from the recorder. Because this sealing occurred at midnight, there was a delay, sometimes as long as 32 hours, before the tapes were deposited in the DEA evidence vault. Nevertheless, the court finds that the immediate heat sealing and other precautions taken by Agent Abbott virtually ensured the tapes that he sealed against tampering. The court also finds that the delay in sealing these tapes did not prejudice the accused in their defense.

Yet the court notes that Agent Abbott sealed only about 5 of the wiretap tapes. There was no evidence presented as to the custody practices of Agent Giandana, who sealed and then delivered to the vault approximately 21 of the 26 tapes. Accordingly, the court cannot find that these 21 tapes were adequately protected against tampering.

After considering all these factors, the court concludes that the government has not met the requirements of section 2518(8)(a), and that the tapes must therefore be suppressed. The probable absence of tampering or prejudice does not outweigh the government's lack of diligence, and the length of the delay.

The court is also persuaded by the Second Circuit's opinions in *Gigante* and *Vazquez,* as to the crucial importance of judicial sealing. The government in *Gigante* had conducted its own "haphazard" sealing procedure, *Gigante,* 538 F.2d at 505, which the Second Circuit found inadequate because the government seal was not a seal *"provided by this subsection,"* as 18 U.S.C. 2518(8)(a) requires. *Id.* at 506 [emphasis in original].

*Vazquez* reemphasized the critical importance of *judicial* sealing, stating, "We reject the government's argument ... that the attempted unilateral 'sealing' of the tapes by the investigators themselves, outside the presence of the court, can satisfy [the statute].... [The government's procedures] do not substitute for the presence of a 'seal *provided for by this subsection'* " [emphasis in original] [citations omitted]. *Vazquez,* 605 F.2d at 1278 n. 20. Significantly, the security precautions of *Vazquez* were not criticized as were those of *Gigante.* Even so, they could not substitute for judicial sealing.

*Vazquez* found that a 13 day delay was excused by the diligent efforts of the government to duplicate the tapes so that they might be sealed. This situation, markedly different from that presented

here, was nevertheless held to be a "close" case. *Id.* at 1278–80.

The court's decision here is guided by the strong dicta in *Vazquez* that "today's satisfactory explanation may very well be tomorrow's lame excuse," and that "the failure to foresee and, where possible, prevent sealing delays becomes less justifiable, as law enforcement officials must be expected to learn form their own experiences and those of others." *Id.* at 1280. Following the Second Circuit's opinion in *Vazquez,* the court cannot find that the explanation offered by the government for the sealing delay is justifiable.